## COMMONWEALTH *vs.* GEORGE AWAD.

No. 97-P-2042.

Worcester. April 5, 1999. - June 16, 1999.

Present: PORADA, SMITH, & GREENBERG, JJ.

*Practice, Criminal,* Argument by prosecutor. Motion to suppress. *Identification. Evidence,* Identification.

At the trial of a criminal case, the prosecutor's remarks in closing argument attacking the proper role of defense counsel, suggesting that conduct of the defendant's sister indicated the defendant's consciousness of guilt, appealing to the jurors' sympathy, and trivializing the presumption of innocence and the burden of proof, warranted reversal of the defendant's convictions, in light of the weakness of the Commonwealth's case and the failure of the judge to give more forceful curative instructions. [141-146]

No reason appeared on the record of a hearing on a motion to suppress photographic identifications to warrant a conclusion that the identification process was impermissibly suggestive. [146-147]

INDICTMENT found and returned in the Superior Court Department on April 6, 1995.

A motion to suppress evidence was heard by *James P. Donohue,* J., and the case was tried before him.

*Michael Malkovich* for the defendant.

*Ellyn H. Lazar-Moore,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. The only real issue at the defendant's trial was identification: was he the man who stabbed the female victim in a restaurant parking lot on the evening of November 12, 1994, and ran off with her purse? The evidence linking the defendant to the crime was the victim's identification of the defendant, in several photo arrays, as the man who robbed her, and her in-court identification of the defendant at a probable cause hearing some seven weeks after the incident. In April of 1996, a judge denied the defendant's motion to suppress the identification testimony. At trial following the motion hearing, the defendant

was convicted of armed robbery, assault and battery, armed assault with intent to murder, and armed assault with intent to rob. On appeal the defendant contends, first, that substantial portions of the prosecutor's closing argument exceeded the bounds of proper argument and, second, that the judge erred in denying his motion to suppress. We reverse the judgments.

According to the evidence presented at trial, the female victim, Pamela Zion, was inside the Aku-Aku, a restaurant in Worcester, at the invitation of the male victim, Edward LaFleur. For three hours they drank, had a meal, and watched stand-up comedians. While there, LaFleur ran into the defendant, with whom he had previously been imprisoned at the Worcester County house of correction. The defendant, short of cash, asked LaFleur to help him out. LaFleur complied. As the evening wore on, however, the defendant made several more entreaties to which Zion took umbrage. She asked the defendant to leave them alone. Thereafter, LaFleur and Zion continued to consume alcoholic beverages. When they left the restaurant at about 10:30 P.M., both were intoxicated.

As they walked across the parking lot to LaFleur's truck, they were approached by a man, later identified by Zion as the defendant, who demanded money. A scuffle broke out between the two men. Zion, to stay out of harm's way, headed toward LaFleur's truck. Then someone, whose face she did not see, grabbed her from behind, stabbed her in the stomach, snatched her purse, and ran off into the night. The episode lasted only several minutes.

Several Worcester police officers were called to the scene. Detective William Hinson was the first officer to arrive. Because emergency medical personnel were treating Zion, he was unable to speak with her. She was taken to the University of Massachusetts Medical Center where she underwent extensive surgery to repair her wounds. Hinson did interview LaFleur that night in the parking lot. There he told his story: the person who had stabbed Zion and taken her purse was a white male, about six feet three inches tall, thin build, wearing eyeglasses, dark skinned, and named "George."

Based upon this description, as well as information provided to the police by an anonymous caller, Hinson obtained a photograph of the defendant which he added to an array of four other photographs depicting young men wearing eyeglasses.

On the morning of November 14, 1994, Hinson went to the

intensive care unit of the University of Massachusetts Medical Center, where Zion lay in the recovery room. After Zion looked at the five photographs, he asked whether she could identify the person who stabbed her. She removed the defendant's photograph and told Hinson that she believed the man depicted in the picture was the assailant but that she was uncertain because of her groggy condition. She did not recall the man wearing glasses at the time of the robbery.

Zion had no difficulty at trial identifying the defendant as the robber. Called by the prosecution, LaFleur recanted both his earlier photographic identification of the defendant as the assailant and his testimony at the probable cause hearing in which he had implicated the defendant. Some time after the events in question, LaFleur had again found himself in prison with the defendant. While there, LaFleur observed the defendant and decided that the defendant's build and other physical characteristics were incongruent with the man who had confronted him in the parking lot. For his part, the defendant elected not to testify, relying instead on counsel's cross-examination of Zion to raise questions about the reliability of the identification testimony.

1. The defendant objected at trial to a number of comments in the prosecutor's closing argument. The prosecutor began by commenting on the strength of Zion's identification testimony. He then asked the jury to consider why defense counsel, in his closing, cast doubt on the reliability of her testimony. The prosecutor said:

> "Now, I am told that some play by Shakespeare — I forget which one, but us lawyers hear it all the time, it is in all of our — lot of our legal stuff — somebody was — created the revolution in England, and the revolutionary said, 'First thing we do when we take over, kill all the lawyers.' We've always had a bad reputation, us lawyers. I think part of it comes down to you take a set of facts and [see] what you can weave out of any set of facts. There isn't one case that some argument can't be made to any jury, and this is a perfect example."

Within reason, prosecutors may be critical of the tactics utilized by trial counsel in defending a case. See *Commonwealth v. Borodine*, 371 Mass. 1, 11 (1976), cert. denied, 429 U.S.

1049 (1977); *Commonwealth* v. *Cheek*, 374 Mass. 613, 618 (1978); *Commonwealth* v. *Gonzalez*, 22 Mass. App. Ct. 274, 282 (1986). In this case, however, the prosecutor's comment was inappropriate. Disparaging remarks about the qualifications or motivations of defense counsel, or lawyers in general, are disfavored. It is improper for a prosecutor to state that, unlike the jury, the role of defense counsel is not to seek the truth but rather to create doubts concerning the evidence. *Commonwealth* v. *Hawley*, 380 Mass. 70, 82-90 (1980) (prosecutor's suggestion that because trial counsel witnessed the affidavits of the defendants, he was an active participant in the alleged perjury, was unwarranted). Compare *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 271-273 (1982) (viewed in context, prosecutor's claim that witnesses refused to lie, based on evidence that they may have told a different story to defense counsel, did not imply that trial counsel tried to suborn perjury). Thus, the prosecutor's attack on the role of defense counsel distracted the jury from its proper role. Unlike the situation in *Commonwealth* v. *Weaver*, 400 Mass. 612, 615 (1987), where the prosecutor told the jury that defense counsel's "special function is not to seek the truth, as you must do . . . [but] to create doubts in your minds," and upon the defendant's objection, the judge gave a curative instruction, *id.* at 616, the judge in this case did not tailor any curative instruction to the jury to deal with the is-sue.[1] See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

There was evidence that the defendant's sister, two days after the robbery, was confronted by the police as she left the house where she lived with the defendant. The officers informed her that they had a warrant for the defendant's arrest, and they sought permission to enter the house. Despite their request, she refused them entry saying, "I am on my way to work. I have to go." Following this testimony, the prosecutor asked her the fol-lowing question, "You weren't going to help them find your brother whether he was in the apartment or not, correct?" She responded in the affirmative.

In the course of his closing, the prosecutor devoted consider-able attention to her testimony. Among other things, the prosecu-tor asked the jury to consider:

---

[1]There is a "duty" on the part of the trial judge to correct arguments that impinge on constitutionally protected rights. *Commonwealth* v. *Watson*, 377 Mass. 814, 823 (1979). "[T]he better practice is for the judge to intervene on his own motion." *Commonwealth* v. *Hawley*, 380 Mass. at 85, quoting from *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571 (1976).

"How likely is it that you are about to leave your home to go to work, and unless the work has to do with controlling a nuclear plant, something with huge consequences, that you are going to just walk away from your home with a whole number of officers there looking for someone you know is in your home? How likely is it that any one of us are going to do that, just walk away? . . ."

"I suggest to you that the actions do speak much louder than Pamela Zion's words to you, and that the thrusting of a knife the way he did into any human being can only conclude with the intent that somebody doesn't care what happens to that person, and that by thrusting that knife, he doesn't care to the point that he doesn't care if she dies. And he ought to take responsibility for it, not have his sister come here and try to cover for him on some idiotic thing that she's going to laugh off this victim. The actions must speak louder than the words you have heard."

At the close of the prosecutor's argument, the defendant objected to these remarks and others to which we shall refer. Trial counsel specifically asked the judge to correct these statements in his final instructions. At the close of the court's charge, which did not include any forceful or specific curative instructions, the defendant did not object to any alleged omission in the charge or ask for any instructions relating to this matter.[2]

These particular remarks could be construed as a comment on the defendant's failure to offer testimony or evidence in his defense. "Ordinarily, it is improper for the prosecutor to comment on the failure of the defense to present certain evidence." *Commonwealth* v. *Smith*, 404 Mass. 1, 7 (1989). See *Commonwealth* v. *Fernandes*, 30 Mass. App. Ct. 335, 342-343 (1991). Should persuasive reasons exist for the jury to draw a negative inference from the fact that a defendant failed to offer

---

[2]We note, however, that trial counsel need not achieve perfection in identifying the impropriety or in offering an alternative so long as the objection alerts the judge to the basis of the counsel's complaint and gives the court an opportunity to correct the error. *Commonwealth* v. *Cancel*, 394 Mass. 567, 573 (1985). Defense counsel sufficiently apprised the judge of the grounds on which he objected to the prosecutor's closing argument given the many occasions objectionable comments were presented to the jury. See *Commonwealth* v. *Person*, 400 Mass. 136, 138-143 (1987) (objection at the conclusion of the prosecutor's argument is sufficient to preserve the defendant's rights).

evidence on a critical issue, it is fair game for a prosecutor to comment on "the 'general weakness' of the defendant's account . . . ." *Commonwealth* v. *Porter*, 15 Mass. App. Ct. 331, 336 (1983), quoting from *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980). See *Commonwealth* v. *Martino*, 412 Mass. 267, 282-284 (1992) (prosecutor could comment on inconsistency between a defendant's detailed statement to police and his subsequent testimony at trial and argue that omissions from the first version constitute consciousness of guilt); *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 306, 308 (1992) (proper to contrast defendant's lack of explanation to family regarding child's death with details defense offered at trial).

Here there was no showing that the defendant's sister's account of what occurred when the police came to her house indicated the defendant's consciousness of guilt. There was no explanation of why the sister had a duty to assist the police. It is wrong for a prosecutor to question a witness in a manner which implies that the defendant has something to hide or "fears to face the music." *Commonwealth* v. *Sherick*, 23 Mass. App. Ct. 338, 343, *S.C.*, 401 Mass. 302 (1987). *Commonwealth* v. *Smith*, 387 Mass. 900, 908-909 (1983).

Even more troublesome were the following statements by the prosecutor:

> "So why are you here as jurors? Every defendant that sits in this table where the defendant sits starts a case presumed innocent. That's not new. We all know that. We know that from grammar school days. And he is innocent until a jury concludes he's guilty . . . .
>
> "And until then, the Government has to prove a case, meaning having a jury listen to it, considering it, and in all good conscience, do you think, 'Yeah, I wasn't there,' as jurors, 'yeah, I wasn't there. How else could it have happened? Sounds right. These people say that. I don't know this witness,' because you know none of these people, 'sounds like that's what happened.' So until the jury comes back, nobody is ever guilty. And until a jury comes back and through the foreperson says, 'We have decided. We have concluded guilty,' everybody is innocent. Nothing is new about that.

"So it is you, as members of the community, that are such an important part of our democracy here. I don't say that lightly. Those aren't just light words, folks. If upon hearing this evidence you heard in this case you can honestly come back and go back to your homes and say that this man is innocent of what he did to that woman, then so be it, so be your conscience. But conscience — but any judgment — any judge will tell you, will be based on your judgment. Your conscience, simply to be fair to everybody. We ask you to be more than fair. We ask you to consider the evidence. . . .

"I suggest you come to the same conclusion and say to Mr. Awad through your foreperson, 'Awad, we've considered the evidence. There's got to be a finality to this thing. The finality is our judgment that not only did you aggravate him inside the bar, not only did you try again for about the fourth or fifth time to ask for more money, but you can't go around forcing people to give you money. It's one thing to maybe beg or urge or to coax along, it is another thing to do it violently. That's why we have an ordered society.' "

While ostensibly advising the jury of the presumption of innocence, the prosecutor's insinuation that the presumption of innocence is old hat was better left unsaid. However, advising the jury that all the government need do to establish the defendant's guilt is to introduce evidence that "sounds right," and that it would be on their "conscience" to ignore that evidence, impermissibly shifts the burden of proof. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 112-117 (1987) (improper burden shifting to state that the jury should acquit the defendant "if you find that he is truly innocent" or to suggest what needs to happen "in order to find the defendant not guilty," but no substantial risk of a miscarriage of justice in light of entire argument and judge's detailed instructions). The prosecutor compounded the mistake by an improper appeal to the jury's sense of duty. An experienced prosecutor should know that it is wrong to suggest that the jury should consider the consequences of the verdict. *Commonwealth* v. *Smith*, 387 Mass. at 910-911. Nor, in this context, is it appropriate to suggest that the jury's "conscience" dictates a guilty verdict. *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 572-573 (1991), cert. denied,

504 U.S. 922 (1992). The remark was as inflammatory as the one which, upon proper objection, was determined to be reversible error in *Commonwealth* v. *Sevieri*, 21 Mass. App. Ct. 745, 753-755 (1986) ("Do you really want to go home tonight and tell your family . . . ?"). An appeal that enlists the jurors on the side of the government as "members of the community" to protect innocent victims from violent crime has no place in trial advocacy. See *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375-377 (1989).

The cumulative effect of the prosecutor's "ill-advised rhetoric" had the effect of minimizing the jury's role as fact finders. *Commonwealth* v. *Harris*, 11 Mass. App. Ct. 165, 176 (1981) (citation omitted). Standing alone, each of the remarks would not invite reversal, but the entire presentation was inexcusable. See *Commonwealth* v. *Smith*, 387 Mass. at 912; *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. 577, 581 (1993).

Should a new trial be ordered because of the misconduct? On balance, we conclude that the weakness of the identification, in addition to the judge's less than forceful admonition to the jury that "[t]he fact-finding process belongs to you and to you alone," is enough to warrant reversal. Here the judge, in his instructions to the jury, failed to include any mitigating language to dampen the prosecutor's appeal to sympathy or trivializing comments about the presumption of innocence and the burden of proof. Contrast *Commonwealth* v. *Porter*, 24 Mass. App. Ct. 694, 698 (1987). We are unable to say with confidence that the judge's instructions adequately cured the prosecutor's invitation to the jury to bring closure to the case by convicting the defendant. Most important, because of the substantial disparity between the identification testimony of Zion and LaFleur, we think the prosecutor's remarks may well have made a difference in the jury's conclusions. See *Commonwealth* v. *Kozec*, 399 Mass. at 518.

2. The defendant, citing *Commonwealth* v. *Botelho*, 369 Mass. 860, 868 (1976), and numerous other cases concerning the suggestibility of the photographic identification process, argues that Zion's testimony should have been suppressed. There has been no showing that in presenting the first photo array to Zion, the police made any suggestion, improper or otherwise, to influence her choice. After the suppression hearing, the judge found that the individuals depicted in each of the photographs matched the description given to Hinson by LaFleur and that the first

photographic array shown to Zion at the hospital was not impermissibly suggestive. We agree that nothing in the record of the suppression hearing indicates that Zion's medical condition or any conduct of the police skewed her tentative identification of the defendant. *Commonwealth* v. *Warren*, 403 Mass. 137, 139 (1988).

As for the defendant's argument that the second photographic array displayed to her immediately before the probable cause hearing at the District Court was impermissibly suggestive because the defendant's photograph was the only one contained in both arrays, that in itself proved nothing. *Commonwealth* v. *Scott*, 408 Mass. 811, 826 (1990). The danger of familiarity was abated because the defendant's physical appearance was quite different in each photograph. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 171 (1984). There was no error in the denial of the motion.

*Judgments reversed.*

*Verdicts set aside.*

*Order denying motion to suppress affirmed.*