## Commonwealth vs. Carlos Luis Gomes.

Bristol. December 9, 2004. - February 22, 2005.

Present: Marshall, C.J., Greaney, Cowin, Sosman, & Cordy, JJ.

*Evidence,* Relevancy and materiality. *Error, Harmless. Practice, Criminal,* Mistrial, Argument by prosecutor, Instructions to jury, Capital case.

A criminal defendant convicted of murder in the first degree failed to demonstrate that his conviction should be overturned because certain testimony was improperly admitted in evidence, where defense counsel's tactical decision not to object to the testimony was not manifestly unreasonable and, even if error, was harmless beyond a reasonable doubt, given the judge's instructions to the jury, the strength of the Commonwealth's case, and the fact that the testimony was relevant to explain the events and background surrounding the murder. [506-508]

At a murder trial, there was no error in the admission of certain testimony that was relevant to the defendant's state of mind at the time of the killing and to prove that he had been the shooter. [508]

At a criminal trial, the judge did not abuse his discretion in denying the defendant's motion for a mistrial based on a police witness's improper reference to "police reports" concerning the defendant, where the testimony included only a single improper reference, and where the judge gave a prompt and forceful curative instruction that the jury were presumed to have followed. [508-509]

At a murder trial, the prosecutor's slip of the tongue in closing argument, which the jury could have interpreted as an improper comment on either the failure of the defendant to testify or the defendant's failure to produce witnesses, did not create a substantial likelihood of a miscarriage of justice, where the remark was isolated, the Commonwealth's case was strong, and the judge's curative instructions were clear, specific, and thorough. [509-510]

No reason appeared on the record of a murder trial for this court to grant relief under G. L. c. 278, § 33E. [510-511]

Indictments found and returned in the Superior Court Department on March 16, 2000.

The cases were tried before *Robert J. Kane,* J., and a motion for a new trial, filed on August 25, 2003, was heard by him.

*Leslie W. O'Brien* for the defendant.

*William R. Connolly,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a shooting that occurred after a dispute over a drink on the early morning of October 30, 1999, a jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation and of unlawful possession of a firearm. The defendant's motion for a new trial was denied by the trial judge. Represented by new counsel on appeal, the defendant argues error in the admission of certain evidence at trial, error in the denial of his motion for a mistrial, and error in the prosecutor's closing argument. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the defendant's convictions and the order denying his motion for a new trial. We also discern no basis to grant relief under G. L. c. 278, § 33E.

The jury could have found the following facts. The shooting occurred in a second-floor, two-bedroom apartment in Fall River. The apartment was shared by three young women, Nancy Cardoza (Cardoza), Cardoza's best friend, Holly Latour (Holly), and Holly's cousin, Melissa Latour (Melissa), and a minor, Holly's niece, Nichole Soares (Soares). Soares, who was fourteen years of age, had run away from her foster home.

At approximately midnight on October 29, 1999, the defendant's brother, Moses Rivera, who was also known as "Tan" and was Holly's former boy friend, telephoned the apartment and spoke with Cardoza. Within one-half hour, Tan and the defendant arrived at the apartment. They brought a one-half gallon bottle of vodka and an orange drink. Cardoza and Melissa were in the apartment when Tan and the defendant arrived. Earlier, Holly had gone downstairs to a friend's apartment, and Soares had left the apartment to go out with some friends.

Melissa socialized with the defendant and Tan for a little over one hour, and then went to bed. The defendant drank during this time and appeared intoxicated. Later, sometime between 2:15 A.M. and 2:30 A.M., the victim, Herminio Gouveia, entered the apartment and asked Cardoza, who greeted him, if Ricky Mello was there. Cardoza, thinking that the victim was looking for a different Ricky, Ricky Lopes, told the victim that Ricky was downstairs. The victim left.

On her return, between 2:30 A.M. and 2:45 A.M., Soares went into Holly's room, where Melissa was sleeping. Soares then

went into the bathroom where she saw Tan talking on a cellular telephone and the defendant "bagging coke." Soares asked what they were doing, and the defendant told her to "mind [her] fucking business."

Shortly thereafter, the victim returned to the apartment, asking for Ricky. Soares knew the victim, and she invited him inside. The two talked on the couch. The defendant and Tan left the bathroom and went to the kitchen. The defendant sat across from Cardoza at a table located between the bedrooms. The victim asked the defendant for a drink of vodka, and the defendant said no. The victim was a little agitated, but resumed talking with Soares.

Cardoza announced that it was time for everyone to leave. Tan asked if they could stay for one more drink, and Cardoza relented. On his way to the kitchen, Tan asked the victim if he wanted a drink. The victim responded, "What?" Tan repeated the offer, but the victim could not hear him because of loud music playing. Cardoza finally told the victim to go to the kitchen so that Tan could hear him (the victim), and the victim complied. Tan said he was only going to ask once more if the victim wanted a drink. Soares told the victim not to take the drink. The victim said he did not want the drink. The defendant then told the victim not to "disrespect" his brother, and a physical altercation between the defendant and the victim ensued. There was pushing and shoving by the defendant and by the victim. Ricardo Lopes, Melissa's former boy friend, walked in.

The defendant pulled out a handgun in the kitchen. The fight moved into the living room, and then to Cardoza's bedroom. The victim said, "Don't disrespect her house," and someone said, "We're going to disrespect that room." In Cardoza's bedroom, the victim was pushed against a wall. The victim said to the defendant, "What are you going to do with that? . . . Let's go outside. Take this outside. Don't disrespect the house." Cardoza saw a gun in the defendant's hand and screamed, "Oh my God, he has a gun." Cardoza threw two cast iron candlestick holders at the defendant while telling him to stop. Melissa, who had been awakened by Soares, screamed and begged the defendant to put the gun away. Both Tan and Lopes told the defendant to put the gun away. The defendant repeatedly said,

"Fuck this nigger." Melissa saw the defendant, who was approximately one foot away from the victim, shoot the victim in the head. Soares, who also witnessed the shooting, estimated the distance between the defendant and the victim as a couple of feet. The victim slumped back against a wall. He died from a single gunshot to the middle portion of his right eyebrow.

The defendant and Tan ran from the apartment. Later that morning, at approximately 9 or 10 A.M., they arrived in Lewiston, Maine, at the home of Jamie Wilson, where they woke up their friend Anthony Tibbetts. The defendant had changed his clothes from a green "warm up suit" to black clothing. He and Tan appeared to be in shock. The defendant told Tibbetts that he and Tan had been at a party in Fall River where Tan had pulled the victim into a back room; that the defendant followed and pulled out a gun and waved it around; that Tan told the defendant to put the gun away at least three times; that Tan told the defendant, "I got it under control"; and that, when the victim asked the defendant, "What [are] you going to do with that?," the defendant shot him. The defendant also told Tibbetts that he ran out of the house to a car, went to a pier or dock, where he threw the gun into the water, and then went to his mother's home. The defendant described the gun he had used as a .38 caliber gun that could hold five rounds of ammunition.

After receiving a telephone call from a Massachusetts State trooper on November 8, 1999, police officers in York, Pennsylvania, located the defendant hiding in a second-floor closet in a local residence. When asked to identify himself, the defendant provided a false name and falsely stated that he was from Florida. During his booking, the defendant told an officer that he was glad it "was over" because "it was hard being on the run." The defendant also stated that he did not mean to kill anyone, that his life had changed in an instant, and that "none of this would have happened if they had not taken his daughter."

A State trooper identified the defendant's fingerprints on a vodka bottle and on two glasses taken from the apartment after the shooting. A single .38 caliber bullet, consistent with having been discharged from a .38 caliber five-shot revolver, was removed from the victim's head. Based on four-inch diameter

gun powder stippling on the victim, the medical examiner opined that the victim had been shot from a distance of between six inches and two to three feet from his face. A State trooper with the firearms identification section testified that a .38 caliber five-shot revolver, the most common of which was a Smith & Wesson J frame, would leave a four-inch diameter gun powder stippling if fired from one to two feet away.

The defendant did not testify. His trial counsel called two law enforcement officers and the private investigator for the defense to elicit inconsistences in the testimony of some of the Commonwealth's witnesses, thereby calling the credibility of those witnesses into question.

1. The defendant argues that his conviction should be reversed because testimony from Soares, that she saw him "bagging" cocaine prior to the shooting, was improperly admitted. We reject the defendant's contention that a new trial is required.

Prior to trial, in connection with a motion in limine filed by the defendant, the judge ruled that Soares could not testify at trial that a white powdery substance that she saw the defendant with in the bathroom of the apartment was cocaine. The judge explained that the Commonwealth had not established that Soares, a teenager, was competent to testify that the powder she saw constituted a specific controlled substance. At trial, the following colloquy occurred between the prosecutor and Soares during her direct examination:

> THE PROSECUTOR: "After going into [the apartment], what did you first observe? Who was there?"
>
> THE WITNESS: "Well, when I first came in [the apartment] on the second floor, I went into my Aunt Holly's room, and that's where Melissa was sleeping. Then I went into the bathroom, and Tan was on the phone, and [the defendant] was bagging coke. Then I went into Melissa's — Nancy's room."
>
> THE PROSECUTOR: "Let me stop you there for one second. Okay? . . . You say that you went to the bathroom, and who was in the bathroom?"
>
> THE WITNESS: "[The defendant] and Tan."

THE PROSECUTOR: "All right. And you say Tan was on the phone?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And what kind of phone was he on?"

THE WITNESS: "A cellular phone."

THE PROSECUTOR: "And you indicate that the defendant was bagging coke?"

THE WITNESS: "Yes."

THE PROSECUTOR: "Could you tell the jury what observations you made to cause you to come to the conclusion that he was bagging coke?"

THE WITNESS: "Well, he — there was a bigger bag and a few small bags . . . ."

Shortly thereafter, Soares testified that she observed the defendant and Tan "putting coke, vodka, and orange juice into a cup." The defendant's trial counsel objected. The judge sustained the objection and instructed the jury as follows: "This witness has no competency at all to tell you if it's coke or what it is, and you are to totally disregard that. Totally, absolutely. That's guesswork."

The defendant's trial counsel, who was aware of the judge's pretrial ruling concerning Soares's expected testimony, did not object to Soares's challenged testimony for stated tactical reasons. In his affidavit supporting the defendant's motion for a new trial, the defendant's trial counsel explained that he believed an objection would have been unsuccessful "because the testimony related to a part of the incident and would be admitted to paint a complete picture of the incident." While the judge did not credit or discredit that reason, the reason cannot be said to be manifestly unreasonable. See *Commonwealth* v. *LaCava*, 438 Mass. 708, 713 (2003). Also, considering that an objection could have resulted in emphasizing the testimony, it would not have been manifestly unreasonable for defense counsel to decline on making an objection to the testimony on that basis alone. See *id.*

Even if we were to conclude that the defendant's trial counsel should have objected, his error (in not doing so) would have been harmless beyond a reasonable doubt. See *Commonwealth* v. *Vinnie,* 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998); *Commonwealth* v. *Libran,* 405 Mass. 634, 643-644 & n.2 (1989). Soares's challenged testimony was relevant in that it explained the events and background surrounding the murder. See *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269-270 (1982). With respect to Soares's belief that the substance she saw was cocaine, the judge instructed the jury, after Soares testified that the defendant and Tan had placed "coke" in a drink, that Soares was not competent to testify if the substance was "coke," and that they were to disregard her testimony. The jury are presumed to follow the judge's instructions and likely were able to analyze Soares's preceding testimony in the context of the judge's specific instruction.[1] Finally, the Commonwealth's case was strong. While carrying a loaded handgun, the defendant started a fight with the victim and then pulled out a gun. The defendant pushed the victim and shouted obscenities at him while others were imploring him to put the gun away. Two witnesses testified that they saw the defendant shoot the victim. The defendant admitted to his friend Tibbetts that he shot the victim. The defendant fled the scene, destroyed evidence, and fled the Commonwealth.

2. Contrary to the defendant's contention, we find no error in the admission of testimony from a Pennsylvania police officer that the defendant stated, during his booking, "that none of this would have happened if they wouldn't have taken [the defendant's] daughter," and evidence that there was a child custody proceeding held in Maine (where the defendant had been living) on October 27, 1999. The evidence was relevant to the defendant's state of mind at the time of the killing and to prove that he had been the shooter.

3. The defendant argues that the judge should have granted his motion for a mistrial based on a witness's improper reference to "police reports" concerning him. The issue arose in the following manner. During the cross-examination of one of the

---

[1]In light of that instruction, we need not reach the issue whether Soares was "competent" to identify the substance as cocaine.

defense witnesses, Detective Thomas Chace of the Fall River police department, the prosecutor questioned Detective Chace about his efforts to find the defendant. Detective Chace testified that he knew the defendant as Carlos Rivera, and that after unsuccessfully looking at the defendant's residence and defendant's parents' house, "[w]e then started to pull old police reports under Carlos Rivera." The defendant's trial counsel objected, and the objection was sustained. The defendant's trial counsel was granted a sidebar conference at which his motion for a mistrial was denied. The judge directed the prosecutor to cease the line of questioning, and then instructed the jury as follows: "Ladies and gentlemen, when I sustain an objection and tell the jury to disregard the testimony, it is certainly the duty of this jury to do so. And I tell you that in terms of the last answer, I instruct you to totally expel from your minds that particular answer, and it has absolutely no bearing in this case, and you will follow that instruction. No bearing at all."

The judge did not abuse his discretion in denying the defendant's motion for a mistrial. See *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982). The testimony included only a single improper reference, and the judge gave a prompt and forceful curative instruction that the jury are presumed to have followed. See *Commonwealth* v. *Morales*, 440 Mass. 536, 548 (2003).

4. In his closing argument, the prosecutor stated the following:

> "You heard from the witnesses. I'll talk a little bit more about them in detail as we get along, but the only one in this courtroom that I've heard say that it wasn't this defendant, the only person who took that stand to say that was [the defendant's trial counsel], because you heard from Nancy Cardoza, you heard from Nicole Soares, you heard from Melissa Latour, you heard from Anthony Tibbetts it was him. And they're all telling you the same thing. This is a fight over a drink."

The defendant's trial counsel objected to this argument on the ground that the prosecutor "misspoke" in stating that he (the defendant's trial counsel) had taken the stand to testify. The

defendant now argues that the prosecutor's remark, that "the only one in this courtroom that I've heard say that it wasn't this defendant, the only person who took that stand to say that was [the defendant's trial counsel]," infringed on his rights under the Fifth Amendment to the United States Constitution and under art. 12 of the Massachusetts Declaration of Rights, thereby creating a substantial likelihood of a miscarriage of justice.

The prosecutor's remark appears to have been a slip of the tongue. The slip, however, was of such a character that the jury could have interpreted the remark as a comment on either the failure of the defendant to have taken the stand to testify or the defendant's failure to produce witnesses; either suggestion is clearly an improper subject of argument. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 701 (2001); *United States* v. *Hardy*, 37 F.3d 753, 757 (1st Cir. 1994). We conclude that the improper remark was harmless beyond a reasonable doubt. See *Commonwealth* v. *Libran*, 405 Mass. 634, 643 (1989). It was an isolated slip, and as has been mentioned, the Commonwealth's case was strong, with two eyewitnesses and the defendant's admissions to Tibbetts. Further, the judge instructed the jury on the presumption of innocence, the prosecutor's burden of proof, and that they should not draw any inference against the defendant based on the fact that he did not testify. The judge also instructed the jury that the statements of the lawyers were not evidence. The judge's instructions were clear, specific, and thorough. In these circumstances, the prosecutor's slip was corrected and does not provide a basis for reversal.

5. In support of his argument that we grant him relief pursuant to G. L. c. 278, § 33E, the defendant acknowledges that premeditation includes conduct taken after only momentary thought. He contends, nonetheless, that the shooting "is surely not so egregious as one carried out following hours or days of planning." Our law makes no such distinction. That one can, in an instant, consciously decide to take the life of another because that person refused an offered drink certainly is just as egregious as carrying out a murder following lengthy planning. Here, four others in the apartment (including the defendant's brother) tried

to dissuade him from his continued assault on the victim, but he rebuffed their efforts. We have reviewed the entire record under our statutory obligation. There is no basis to grant the defendant relief.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*