## Commonwealth *vs.* Tu Trinh.[1]

Suffolk. October 8, 2010. - January 31, 2011.

Present: Marshall, C.J., Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, Argument by prosecutor, Confrontation of witnesses, Capital case. *Evidence,* Consciousness of guilt, Credibility of witness, Expert opinion. *Due Process of Law,* Burden of proof.

At a murder trial, the judge did not err in giving the jury a consciousness of guilt instruction, where that instruction was amply warranted by the temporal connection between the crime and evidence suggesting that the defendant abandoned his residence [779-781]; further, although the judge erred in telling the jury that they had heard evidence about the defendant's state of knowledge, given that nothing in the record suggested the defendant even knew the police were seeking him when he left his residence, that error, considered in the context of the instructions as a whole and of the overwhelming evidence of the defendant's flight, did not create a substantial likelihood of a miscarriage of justice [781-782].

At a murder trial, the judge did not err in declining to instruct the jury on voluntary manslaughter under a theory of provocation, where there was no evidence of any action or combination of action and words that reasonably would have provoked the defendant to draw a gun from his jacket, attempt unsuccessfully to shoot the victim, reload his gun, and then shoot the victim at close range [782-784]; moreover, the judge's declining to give a voluntary manslaughter instruction, even when viewed in light of the judge's proper instruction that the jury could infer malice based on the use of a firearm (i.e., an inherently dangerous weapon), did not create a substantial likelihood of a miscarriage of justice, where this court discerned no impermissible burden shifting or other violation of the defendant's due process rights [784-785].

A prosecutor's inartful remark, made in passing during closing argument at a murder trial, i.e., that a witness for the Commonwealth was honest, did not, when considered in context, amount to improper vouching for the witness's credibility, and in any event, the judge's direct and forceful curative instruction served to dispel any misimpression that may have been left on the jurors. [785-787]

A prosecutor's statements in closing argument at a murder trial, encouraging the jury to consider why defense counsel had failed in closing argument to focus on events that occurred the night of the shooting, did not impermis-

---

[1]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

sibly shift the burden of proof to the defendant, and in any event, the judge's instructions to the jury cured any suggestion or implication of burden shifting. [787-788]

At a murder trial, any prejudice caused by a prosecutor's improper comments in closing argument about the police department was sufficiently mitigated by the judge's specific curative jury instruction; further, this court was not able to conclude that the error made any difference in the jury's conclusions. [788-789]

This court discerned no reason to exercise its authority under G. L. c. 278, § 33E, to reduce the jury's verdict or to grant a new trial, where the erroneous admission of testimonial hearsay, i.e., the testifying medical examiner's description of the findings of the medical examiner who performed the autopsy, did not warrant a new trial, given that the testifying examiner permissibly testified as to his opinion of the cause of death, and other testimony provided a sufficient factual basis for the examiner's opinion. [789-790]

INDICTMENTS found and returned in the Superior Court Department on March 26, 2001.

The cases were tried before *Linda E. Giles*, J.

*David H. Mirsky* for the defendant.

*Zachary Hillman*, Assistant District Attorney (*Mark Lee*, Assistant District Attorney, with him) for the Commonwealth.

BOTSFORD, J. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of deliberate premeditation and of unlawful possession of a firearm.[2] On appeal, the defendant argues that reversal of the murder conviction[3] is warranted because (1) the consciousness of guilt instruction was improper; (2) the judge failed to instruct on the lesser included offense of voluntary manslaughter; (3) that failure, combined with the judge's instruction that malice could be presumed based on evidence of the use of a firearm, impermissibly relieved the Commonwealth of its burden of proving beyond a reasonable doubt every element of the crime; and (4) the prosecutor

[2]The defendant was sentenced on the murder conviction to life imprisonment and on the firearm conviction to a concurrent term of imprisonment of from three to four years.

[3]Although the defendant's brief requests reversal of his "convictions," the firearm conviction is not discussed in the brief itself, nor was it discussed during oral argument by the defendant's appellate counsel. Accordingly, any claim concerning that conviction is waived. See *Commonwealth* v. *Aguiar*, 400 Mass. 508, 509 n.1 (1987).

made prejudicial remarks in closing argument. We affirm the judgment of conviction and discern no basis to exercise our authority under G. L. c. 278, § 33E.

1. *Facts.* We summarize the facts as the jury reasonably could have found them, reserving recitation of certain facts to later portions of this opinion. On the night of January 23, 2001, two men, Quang Ly and his friend, the defendant, interrupted a Chinese New Year celebration at a home in the Dorchester section of Boston. Earlier that evening, Ly had gone by himself to the same home several times to collect a gambling debt owed him by one of the party guests, Tuan Dao, and Dao had paid the debt. Some of the partygoers were upset at Ly for his intrusions because they considered it bad luck to try to collect a debt on the new year.

When Quang Ly appeared at the doorway of the home with the defendant, a crowd of guests, including the victim, Sinh Tran, gathered. The victim addressed one of the two men, either the defendant or Ly, by name. A "little shoving match" ensued among the victim, the defendant, and Ly. No blows were exchanged, however, and the defendant and Ly eventually walked away from the house.

Dao followed the two men outside.[4] He stood on the sidewalk, facing Ly. Although it was nighttime, the street was well lit by streetlights. Ly and Dao "exchanged words" with each other while the defendant watched from the sidewalk. The defendant asked Dao whether he had paid the money he owed to Ly, and Dao responded that he had. With that, Dao went back inside the home. Dao spoke to the victim, who was Dao's uncle and who wanted to "check to see who came to the house." Dao and the victim left the house, followed by several of their friends. Outside, Ly and the defendant were walking slowly away from the house. The victim approached the defendant and asked him what had happened. Not receiving an answer, the victim continued to ask the defendant what was going on and why had he come to the family's party to start trouble with the victim's younger relatives.

---

[4]Tuan Dao had played cards and drunk socially with the defendant before January 23, 2001, the night of the killing. After the killing, Dao identified the defendant in a photograph from an album shown to him by the victim's former girl friend.

The defendant stood silently with his hands in his pockets. As the victim came closer, however, the defendant pulled a gun from his pocket. Pointing it at the victim's head, the defendant pulled the trigger, but the gun did not fire. Seeing the gun, friends of the victim moved toward Ly and wrestled him to the ground. Guests inside the party could hear shouting and screaming outside. Meanwhile, the defendant moved from the sidewalk toward a fence next to the house, loaded the gun, and pointed it toward the victim. Simultaneously, Ly pulled a metal object from his pocket, but it dropped to the ground as party guests kicked and punched him. The defendant ran toward a van by which the victim was standing and fired a shot, hitting the victim in the back.

The victim's friends and family continued beating Ly. The defendant fired at least one more shot[5] before managing to escape by means of a black vehicle that had arrived on the street directly after the shooting began. As the defendant entered the vehicle, the driver put his arm out the window and pointed a gun at the victim's friends who were holding Ly to prevent him from also escaping into the vehicle. At the street corner, the defendant jumped out of the vehicle long enough to fire more shots at the crowd and shout, "I have more ammo, and I'm going to kill you guys all."

Police and an ambulance arrived at the scene shortly thereafter. The victim was taken to a hospital, where efforts to save his life proved unsuccessful. Among the items the police recovered from the scene were one spent .22 shell casing, seven .380 shell casings, one .380 caliber bullet, a .38 revolver found underneath a car, a leather jacket, and cash. The cause of the victim's death was a gunshot wound.

2. *Consciousness of guilt instruction.* The defendant mounts a two-pronged attack on the judge's consciousness of guilt instruction: the evidence was insufficient to justify giving the instruction, and the instruction itself was erroneous. We disagree with both contentions.

With respect to the defendant's first point, because the defendant preserved his objection, our review asks whether giving the

---

[5]One guest attempted to attack the defendant after the victim fell to the ground, but the defendant shot at him and the guest ran from the defendant.

consciousness of guilt instruction amounted to prejudicial error. See *Commonwealth* v. *Vick*, 454 Mass. 418, 423 n.5 (2009).

"Consciousness of guilt instructions are permissible when there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). While evidence of actions suggesting consciousness of guilt alone are not sufficient to convict, a jury "may, but need not, consider such evidence as one of the factors tending to prove the guilt of the defendant." *Commonwealth* v. *Toney, supra* at 585.

The evidence showed that in the course of their investigation of the murder, police officers went to a residence at 35 Elton Street in Dorchester, where they observed a black Jeep Cherokee automobile parked in front of the house. The registration plate on the vehicle was "6639MP." A witness had earlier told officers at the scene that the defendant fled in a vehicle with a registration plate that included the numbers "6639." The police placed the vehicle under "loose surveillance"[6] for approximately one week, during which time the vehicle was not moved from its space in front of 35 Elton Street and no one was seen in the car. Subsequently, police officers seized the vehicle and obtained a warrant to search it. They recovered two prescription pill bottles in the defendant's name and a promissory note for an automobile loan bearing the defendant's name and signature.

Police officers also interviewed the owner of the house at 35 Elton Street. The owner had rented the first-floor apartment in the house to a man named "Tu" who drove a black Jeep, and who lived in the apartment with a woman and a child. The owner stated that he saw "Tu" before the Chinese New Year in 2001, but that after that time, he never saw "Tu" again. In the weeks following the murder, according to the owner, the apartment was abandoned together with all of the tenants' belongings.

The jury further heard evidence that the defendant was arrested in 2005 when he sought to enter the United States from

---

[6]Officers testified that they kept watch on the Jeep periodically, although the Jeep was not under twenty-four hour surveillance.

Vietnam through the San Francisco airport. The defendant's signature on a document waiving extradition from California to Massachusetts resembled the defendant's signature on the promissory note recovered from the Jeep.

We agree with the judge that the "temporal connection" between the crime and evidence suggesting that the defendant abandoned his residence amply warranted giving the consciousness of guilt instruction. The evidence summarized above reasonably could have led a jury to conclude that the defendant fled from his "usual environs" because of his consciousness of guilt. See *Commonwealth* v. *Toney*, 385 Mass. at 583 ("Evidence that a person flees from . . . his usual environs may be probative of a consciousness of guilt regardless of whether he has actual knowledge that he is being sought by the police"). There was no error.

The defendant's second argument is that even if it were permissible to give the instruction, the specific language used by the judge amounted to reversible error.[7] Because the defendant did not specifically object to the language of the consciousness of guilt instruction at trial, we review to consider whether the error,

---

[7]The judge instructed the jury on consciousness of guilt as follows:

"Now, you have heard evidence suggesting that the defendant may have fled from his home *after he discovered that he was about to be arrested for the offenses for which he is now on trial*. If you do not accept that evidence as true then you are to disregard this instruction. However, if the Commonwealth has proven that the defendant did flee from his home, you may consider whether such actions indicate feelings of guilt by the defendant, and whether in turn such feelings of guilt might tend to show actual guilt on these charges. You are not required to draw such inferences, and you should not do so unless they appear to be reasonable in light of all the circumstances of this case.

"If you decide that such inferences are reasonable it will be up to you to decide how much importance to give them, but you should always remember that there may be numerous reasons why an innocent person might do such things. Such conduct does not necessarily reflect feelings of guilt. Please also bear in mind that a person having feelings of guilt is not necessarily guilty, in fact, for such feelings are sometimes found in innocent people. Finally, remember that standing alone such evidence is never enough by itself to convict a person of a crime. You may not find the defendant guilty on such evidence alone, but you may consider it in your deliberations along with all the other evidence." (Emphasis added.)

if any, created a substantial likelihood of a miscarriage of justice.[8] See *Commonwealth* v. *Serino*, 436 Mass. 408, 419 (2002).

The judge should not have told the jury that they heard evidence about the defendant's state of knowledge. See *Commonwealth* v. *Haraldstad*, 16 Mass. App. Ct. 565, 570 (1983) ("It is error to instruct a jury on consciousness of guilt based on facts without reasonable support in the record"). There was no evidence to the effect that the defendant discovered he was about to be arrested and therefore fled. Indeed, nothing in the record suggested that the defendant even knew the police had begun to look for him when he left the apartment, never to return.

Nevertheless, the judge's error does not amount to reversible error. It occurred in the first part of a lengthy jury instruction on consciousness of guilt that was otherwise proper, see *Commonwealth* v. *Toney*, 385 Mass. at 585, and that was embedded in a comprehensive charge to the jury. See, e.g., *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), quoting *Commonwealth* v. *Galford*, 413 Mass. 364, 371-372 (1992), cert. denied, 506 U.S. 1065 (1993) (appellate court reviews instructions as whole, considering adequacy "in light of their over-all impact on the jury"). Moreover, before giving the instruction on consciousness of guilt, the judge in her general charge instructed the jury that "[i]f your memory of the testimony differs from the attorneys or mine it's your collective recollection that controls when you go back to deliberate." When the brief improper reference noted above is considered in the context of the instructions as a whole and of the overwhelming evidence of the defendant's flight, we are satisfied that "if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

3. *Voluntary manslaughter*. The defendant argues that the judge should have given an instruction on voluntary manslaughter based on a theory of provocation. He further contends that the judge's failure to give the instruction, combined with her instruction that the jury might infer malice from the intentional use

---

[8]Our review of the record does not support the defendant's claim that he objected to the actual language of the consciousness of guilt instruction. In any event, even if the defendant had raised a timely objection and was entitled to the more lenient standard of review, we would still conclude there was no reversible error, for the reasons discussed hereafter in the text.

of a dangerous weapon such as a firearm, shifted to the defend-ant the Commonwealth's burden of proving malice beyond a reasonable doubt, a violation of the defendant's due process rights. See *Francis* v. *Franklin*, 471 U.S. 307, 313-318 (1985). There was no error.

a. *Manslaughter instruction.* "Voluntary manslaughter is unlawful homicide arising not from malice, but 'from the frailty of human nature,' as in a case of 'sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense.' " *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990), quoting *Commonwealth* v. *Nardone*, 406 Mass. 123, 130-131 (1989). For voluntary manslaughter under a theory of provocation, the provocative event must be one that would arouse "in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that . . . actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). "Mere words generally do not con-stitute sufficient provocation to warrant an instruction on [man-slaughter]." *Commonwealth* v. *Vick*, 454 Mass. 418, 429 (2009), and cases cited. With these principles in mind, we review the evidence in the light most favorable to the defendant.

We cannot agree with the defendant that the evidence demon-strated the shooting "occurred as some form of response to a direct threat upon the shooter's life." The fact that the police collected two different types of guns and several different caliber shell casings from the scene did not suggest that "deadly force" was directed toward the defendant, where the victim was unarmed and the witnesses testified to seeing only the defendant and the driver of the Jeep with firearms.[9] There was no evidence of any action or a combination of action and words on the part of the victim (or anyone else) that reasonably would have provoked the defendant to draw a gun from his jacket, attempt unsuccess-fully to shoot the victim, reload his gun, and then shoot the

---

[9]It is true, as the defendant asserts, that witnesses heard what sounded like metal dropping when Quang Ly was accosted near the car, and that police recovered a gun near the spot where the altercation with Ly occurred. However, no evidence suggested that this gun was pointed or fired at the defendant, or that the defendant was even aware at the time that the gun existed.

victim at close range.[10] See *Commonwealth* v. *Burgess,* 450
Mass. 422, 438 (2008) ("Insults and arguments are insufficient
provocation for manslaughter" [citation omitted]). See also
*Commonwealth* v. *Keohane,* 444 Mass. 563, 567 n.2 (2005),
and cases cited.[11]

b. *Due process.* The defendant argues that the judge's failure
to give a manslaughter instruction, together with the language
of her instruction on the inference of malice, created "an imper-
missible presumption of [the] absence of heat of passion, despite
the evidence to the contrary, in violation of the Due Process
Clause." Because the defendant did not raise the issue at trial,
we review the judge's actions to determine whether they cre-
ated a substantial likelihood of a miscarriage of justice.

The judge's instruction that the jury could infer malice based
on the use of a firearm, an inherently dangerous weapon, was
proper.[12] See *Commonwealth* v. *Smith,* 456 Mass. 476, 488 (2010)
("It was not error to instruct that one may infer an intent to kill
from the use of a firearm").[13] See also *Commonwealth* v. *Oli-
veira,* 445 Mass. 837, 842-845 (2006) (permissible to instruct
jury on inference of malice based on use of dangerous weapon [a
knife] so long as words "you are permitted to infer" are used

[10]Although the defendant claims that an unidentified person at the scene
shouted, "I have more ammo, and I'm going to kill you guys all," the one
witness who could positively identify the speaker of those words identified
him as the defendant himself. And while the evidence does show, as the
defendant claims, that the crowd in the street were shouting and that Ly was
being wrestled to the ground and kicked and punched, the victim did not
participate in these events.

[11]To the extent that the defendant suggests that a manslaughter instruction
was required on a theory of use of excessive force in self-defense or defense
of another, there is a similar lack of evidence. See *Commonwealth* v. *Vick,* 454
Mass. 418, 429 (2009) ("Courts are reluctant to find mitigation warranting an
instruction on a lesser included offense when the defendant confronts the
victim while armed with a deadly weapon").

[12]The judge instructed: "As a general rule you are permitted to infer that a
person who intentionally uses a dangerous weapon on another person is acting
with malice. A dangerous weapon is an item which is capable of causing seri-
ous injury or death. I instruct you as a matter of law that a firearm is a
dangerous weapon."

[13]Because a firearm is inherently dangerous, we do not need to decide
whether such an instruction permitting an inference of malice to be drawn
would be proper if the weapon at issue were less dangerous — a shod foot,
for example.

and judge does not compel jury to make this inference). Because the instruction itself was correct and, as previously discussed, the evidence in this case provided no basis for the judge to instruct the jury on voluntary manslaughter, we discern no impermissible burden shifting or other violation of the defendant's due process rights.

4. *Closing argument.* The defendant asserts that the prosecutor made a "series of improper and highly prejudicial remarks" during closing argument that amount to reversible error. Because the claims of error were preserved, we review each category to determine whether the prosecutor's remarks were improper and, if so, whether any improprieties were prejudicial.[14] We analyze the defendant's claim "in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 565 (2002), quoting *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984). Here, aside from the isolated remarks we discuss below, the argument properly concentrated on the evidence presented at trial; the closing taken as a whole was not improper. *Commonwealth* v. *Sylvia*, 456 Mass. 182, 193, 194 (2010).

First, we consider whether the prosecutor impermissibly vouched for the credibility of the witness Tuan Dao. In attempting to rebut defense counsel's focus on the inconsistencies between Dao's grand jury testimony and his testimony at trial, the prosecutor stated: "I mean, think about it, folks. You saw him. Do you think that he sometime became a pawn of the Boston police department? Did they put him up to say all that stuff so they can match it with their version of the case? With all due respect, the man was honest, but he couldn't organize a trip to the bathroom." Although the judge overruled defense

---

[14]The defendant identifies in his brief four specific statements by the prosecutor as improper; at oral argument his counsel contended there were eight instances of improper remarks. Because all the specific objections raised by the defendant on appeal may be categorized under one of the three broad objections that the defendant's trial counsel articulated after the prosecutor's closing, we consider the objections to the remarks challenged on appeal as having been properly preserved. See *Commonwealth* v. *Hollie*, 47 Mass. App. Ct. 538, 541 n.3 (1999) ("trial counsel need not achieve perfection in identifying every impropriety or in offering an alternative so long as the objection alerts the judge to the grounds on which trial counsel objected to the prosecutor's closing argument").

counsel's immediate objection, following the prosecutor's argument, defense counsel asked for a curative instruction that the prosecutor could not vouch for Dao's honesty. The judge agreed and gave the curative instruction.[15]

A prosecutor, of course, may not vouch for the credibility of his or her witness. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). "Improper vouching can occur if an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury." *Id.* Arguably, the prosecutor's statement about Dao might be seen to raise that possibility, but considered in context, we think it was likely understood as an inartful remark in passing that was intended to encourage the jury to consider all aspects of what they saw and heard from Dao in assessing his credibility, including any apparent limitations of Dao's intelligence. The prosecutor told the jury several times in the course of his closing that they as the fact finders should not take the Commonwealth's witnesses' testimony at face value but should consider it in light of corroborating evidence and what they observed of the witnesses' demeanor under oath. His use of the word "honest" was in connection with a lengthy discussion of the evidence the prosecutor claimed corroborated Dao's account.[16] See *Commonwealth* v. *Wilson*, *supra*. In any event, the judge's direct and forceful curative instruction served to dispel any misimpression that use of the word "honest" in reference to Dao may have left on jurors.[17] See *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989) ("judge correctly relied

---

[15]The judge stated: "[The prosecutor] made a reference to one of the witnesses in this case, Mr. Dao, and he referred to him as honest. [The prosecutor], nor any attorney, can never comment on the credibility of a witness. [The prosecutor] doesn't know whether or not Mr. Dao is telling the truth or not, so he cannot refer to him as honest or not, or vouch for his credibility or his honesty."

[16]Among the corroborative evidence summarized by the prosecutor in his discussion of Dao's testimony was the following: blood found near the driver's side of the van near where Dao, and other witnesses, claimed the victim was shot; Ly's leather jacket discovered near where Dao explained Ly was beaten; four $50 bills found in Ly's jacket, which corroborated Dao's testimony that Ly was given four $50 bills; and evidence suggesting that the black Jeep identified by Dao as the getaway vehicle belonged to the defendant. Ballistic evidence found at the scene corroborated Dao's testimony as well.

[17]The defendant's reliance on *Commonwealth* v. *Williams*, 450 Mass. 894,

on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant"). Contrast *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 808 (2009).

We turn to the prosecutor's statements that allegedly shifted impermissibly the burden of proof to the defendant. Several times during the prosecutor's closing he encouraged the jury to consider why the defendant's trial counsel had failed in her closing argument to focus on events that occurred on the night of the shooting.[18] The strong implication of these remarks was that the defense closing was avoiding grappling with adverse evidence.

We recently examined the issue of prosecutorial burden shifting during closing argument in *Commonwealth* v. *Miranda, ante* 100 (2010). There we noted that a prosecutor shifts the burden of proof when, for example, he or she calls the jury's attention to the defendant's failure to call a witness or witnesses, or when the prosecutor offers "direct comment on a defendant's failure to contradict testimony." *Id.* at 117, citing *Commonwealth* v. *Amirault*, 404 Mass. at 240. In each case, the prosecution is signaling to the jury that the defendant has an affirmative duty to bring forth evidence of his innocence, thereby lessening the Commonwealth's burden to prove every element of a crime. In

---

902-906 (2008), is misplaced. There, the prosecutor discoursed at length about what he had done to assure himself of the truth of the witness's testimony, the evidence was not overwhelming, and the judge failed to give a specific curative instruction. This case does not present comparable prejudicial concerns.

[18]A sampling of the prosecutor's allegedly burden-shifting remarks includes: "And I told you in my opening remarks . . . that the central issue in this case was whether this defendant is the person who shot and killed Sinh Tran on January 23, 2001, and whether the identifications of this defendant were accurate, correct, and truthful. That was the issue on day one, it's the issue right now, so does it not strike you as the least bit strange that you heard an entire closing argument that lasted nearly thirty minutes that didn't once discuss what happened on the street January 23, 2001? . . .

"[D]on't you think that some of the factors that you would want to think about when you're trying to assess whether someone has made a correction [*sic*] identification, wouldn't you want those things to be sort of at the forefront? . . . Didn't you want to know a little bit about the vantage point, the circumstances under which you saw the defendant?"

While reminding the jurors that each eyewitness had seen the defendant's face multiple times during the course of the incident, the prosecutor asked the jurors, "Weren't you the least bit interested in thinking about that during the defense's closing?"

contrast, it is not improper per se for a prosecutor to point out to the jury that cross-examination did not produce factual inconsistencies in the testimony of prosecution witnesses, even if such remarks imply that the defendant left material elements of the Commonwealth's evidence uncontested. *Commonwealth* v. *Miranda, supra.* See *Commonwealth* v. *Cohen,* 412 Mass. 375, 388 (1992) (prosecutor may critique defense counsel's trial tactics). Our scrutiny of the record persuades us the prosecutor's remarks fell into the permissible area of comments highlighting corroboration of credibility and consistency and did not cross over into burden shifting. Further, if there were any suggestion or implication of burden shifting in the prosecutor's remarks, the judge cured it when she interrupted the prosecutor's argument to remind the jury that the defendant has no obligation to present any evidence; emphasized the Commonwealth's burden multiple times during her jury instructions; and instructed the jury on two different occasions that closing arguments were not evidence. See *Commonwealth* v. *Miranda, supra*; *Commonwealth* v. *Montez,* 450 Mass. 736, 747 (2008).[19]

The prosecutor's closing comments about the Boston police department, however, deserve separate attention. The prosecutor told the jury: "I'm not making light of this [alleged police investigative failure or incompetence] because I think this is not a serious situation, but to come in here and point the finger at the Boston police department because it's easy to do is just not fair and it's not right." The defendant's counsel promptly objected to the remark, was overruled, and then objected again at the close of the prosecutor's argument.[20] See *Commonwealth* v. *Grandison,* 433 Mass. 135, 143 (2001) (improper for prosecutor "to suggest to the jury that it was impermissible for defense counsel to question the veracity of the police officers . . . .

---

[19]*Commonwealth* v. *Awad,* 47 Mass. App. Ct. 139 (1999), is not to the contrary. In the *Awad* case, the prosecutor's closing remarks concerning lawyers' "bad reputation" was inappropriate because "[d]isparaging remarks about the *qualifications* or *motivations* of defense counsel, or lawyers in general, are disfavored" (emphasis added). *Id.* at 141, 142. In this case, although the prosecutor's criticism of defense counsel's tactics was sharp, it did not amount to an indictment of her qualifications or her honesty.

[20]Defense counsel stated to the judge: "[I]t certainly is burden shifting to suggest that it's wrong of the defense to cross-examine witnesses [the police officers] about what they didn't do."

That is the essence of cross-examination"). Whether an error of consequence in closing argument is reversible "depends on our consideration of '(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions.' " *Commonwealth* v. *Silva-Santiago*, 453 Mass. at 807, quoting *Commonwealth* v. *Perez*, 444 Mass. 143, 151 (2005); *Commonwealth* v. *Dagley*, 442 Mass. 713, 725 (2004), cert. denied, 544 U.S. 930 (2005) (fourth factor "most important").

Here, the judge sufficiently mitigated any possible prejudice by giving the jury a specific curative instruction,[21] which we presume the jury to have understood and followed. *Commonwealth* v. *Sylvia*, 456 Mass. 182, 195 (2010). Moreover, in light of defense counsel's repeated and vigorous exposure of alleged investigative irregularities, which she elicited through cross-examination, we do not believe that the error made any difference to the jury's conclusions. See *Commonwealth* v. *Dagley*, 442 Mass. at 725.[22]

5. *Review under G. L. c. 278, § 33E.* Our review of the record pursuant to G. L. c. 278, § 33E, reveals one issue that requires

---

[21]In response to defense counsel's objection, see note 20, *supra*, the prosecutor told the judge at sidebar, "I think it's fair comment for the Commonwealth to comment on whether the attack on the police was warranted under the circumstances, and that was what my comment was directed towards, so given the level of work that was done by the [police] the criticism was unwarranted." The judge then told the jury: "[A]lso to the extent that [the prosecutor] made reference to [defense counsel] attacking the Boston police department and her attack being unfair and not right, what [the prosecutor] meant to say was that it was unwarranted. Certainly [defense counsel] has every right as a criminal defense attorney [to] attack . . . a party or individual in the case as she sees fit[]. What [the prosecutor] meant to say . . . was, in his view, based on the state of the evidence and the circumstances of this case[,] that it was unwarranted, not that it was not right or unfair."

[22]We comment on one additional set of remarks in the prosecutor's closing argument. The prosecutor analogized the defense's trial tactics to "little kids at a campfire dancing around the fire," not wanting to "get too close, because they don't want to get burned." Following the analogy, the prosecutor reinforced this suggestion: "If [defense counsel] had set foot anywhere near this part of Kimball Street she wouldn't have been able to question a single one of those witnesses because they saw what they saw."

Although the prosecutor's references to getting "burned" and defense

brief discussion, but not reversal. The medical examiner who testified at trial was not the medical examiner who performed the autopsy and signed the death certificate. Some of the testimony was objectionable, although the defendant did not object. In particular, the testifying medical examiner's description of the original medical examiner's findings, as outlined in the autopsy report, was inadmissible testimonial hearsay. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 393 (2008). The admission of this testimony does not warrant a new trial because the testifying medical examiner could permissibly and did testify as to his opinion of the cause of the victim's death, see, e.g., *id.* at 389-390; the cause of death in any event was not contested; and the eyewitness testimony concerning the shooting provided a sufficient factual basis for the medical examiner's opinion that the cause of the victim's death was a gunshot wound. See *Commonwealth* v. *Pena*, 455 Mass. 1, 15 (2009).

*Judgment affirmed.*

counsel's purported inability to question eyewitnesses (whom defense counsel did in fact cross-examine) came close to the line separating proper, if rhetorical, closing argument from burden shifting, we are not persuaded that on balance they would be taken by a reasonable juror as shifting the Commonwealth's burden of proof. The prosecutor's suggestion of diversion here did not rise to the level of implying that the defendant should have taken the stand, see *Commonwealth* v. *Gomes*, 443 Mass. 502, 510 (2005); provided an alibi, see *Commonwealth* v. *Cancel*, 394 Mass. 567, 575 (1985); or called his own witnesses. *Commonwealth* v. *Gomes, supra.*