SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. CARLOS COLINA

 
 Docket:
 SJC-13260
 
 
 Dates:
 April 1, 2024 – November 7, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Homicide. Evidence, Relevancy and materiality, Prior misconduct, State of mind, Intent, Motive, Argument by prosecutor. Constitutional Law, Probable cause. Search and Seizure, Probable cause, Warrant, Affidavit, Computer. Probable Cause. Intent. Practice, Criminal, Warrant, Instructions to jury, Argument by prosecutor, Motion to suppress, Capital case.
 
 

       Indictments found and returned in the
Superior Court Department on June 3, 2015.
      A pretrial motion to suppress evidence was
heard by Laurence D. Pierce, J., and the cases were tried before Elizabeth M.
Fahey, J.
      Elizabeth A. Billowitz (John H. Cunha,
Jr., also present) for the defendant.
      Emily Walsh, Assistant District Attorney
(Nicole Allain, Assistant District Attorney, also present) for the
Commonwealth.
      GEORGES, J.  Late in the evening on April 3, 2015, the
defendant, Carlos Colina, killed Jonathan Camilien in the defendant's Cambridge
apartment by strangling him in a chokehold. 
After killing him, the defendant proceeded to dismember the victim's
body, dispose of the victim's head and limbs in the apartment building's trash
room, and carry a duffel bag containing the victim's torso out to a nearby
walkway, where it was discovered the next morning.  Surveillance video footage of the walkway
quickly led investigators back to the defendant and his apartment, where they
later discovered recordings of rap music, composed by the defendant, that
contained lyrics describing strangulation, murder, and dismemberment.
      In this direct appeal from his conviction
of murder in the first degree,[1] the defendant principally argues that the
admission of recordings and transcripts of the rap music lyrics in evidence was
prejudicial error.  The defendant further
argues that the rap music evidence should have been excluded because it was
seized pursuant to deficient search warrants. 
Additionally, the defendant contends that he was prejudiced by several
other alleged errors, including the improper admission of his record of online
purchase, the prosecutor's mischaracterization of the defendant's testimony
during her closing argument, and the trial judge's failure to give the
defendant's preferred jury instruction on nondeadly force or a voluntary
manslaughter instruction based on sudden combat or reasonable provocation.
      We conclude neither the rap music evidence
nor the record of online purchases was erroneously admitted in evidence.  We further conclude that the trial judge's
nondeadly force instructions were correct, and that any error in the judge's
omission of an instruction on sudden combat or reasonable provocation was not
prejudicial.  While we agree that the
prosecutor's remarks during closing argument were erroneous, the defendant was
not prejudiced.  Finally, after plenary
review of the record, we discern no basis for relief under G. L.
c. 278, § 33E.  Therefore, we
affirm the defendant's convictions.
      1. 
Background.  a.  Facts. 
We summarize the facts the jury could have found, reserving some details
for later discussion.
      On the morning of April 4, 2015, security
personnel from a Cambridge business contacted the police about a suspicious
duffel bag observed in a walkway adjacent to the business's property.  Police officers arrived at the scene shortly
after 8 A.M. and discovered that the bag contained a human torso, appearing to
belong to a male.  Later that day,
security personnel from the business led officers to a conference room, where
they reviewed a surveillance video of the business's property recorded in the
early morning hours of April 4.  The
officers observed on the video, starting at the 4:15 A.M. time stamp, a person
carrying a bag across a street towards the walkway, returning from the walkway
to the same street without the bag, and entering an apartment building, all
over the course of approximately five minutes.
      Directing their investigative efforts to
the apartment building depicted in the surveillance video, police obtained a
time stamped record of key fobs used to enter the apartment building on that
morning of April 4.  From this record,
police learned that a key fob assigned to the defendant was used to enter the
lobby at 4:26 A.M. and that no other key fob was used to enter the apartment
building for a "long period" around this time.  The record also showed the number of the
defendant's apartment, which was located on the third floor.
      Later that same morning, police conducted
a search of the halls, stairwells, and trash rooms of the apartment
building.  In a trash bin in the
third-floor trash room, they discovered human remains -- including upper
left and right limbs, lower left and right limbs, and a human head that
appeared to be that of a male -- within white trash bags that had been
stuffed into two blue draw-string bags branded with the name of a bodybuilding
website.  The trash bin also contained
red-brown stains that later tested positive for the presence of blood.  Officers also found clothes and other items
in the trash bin, including fragments of a driver's license and credit cards
that had been cut into pieces.  From
these fragments, officers obtained the name of the victim, Jonathan Camilien,
as well as his date of birth and photograph.
      While on the third floor in the trash
room, and prior to the trash bags being removed from the trash bin and opened,
police officers heard the sound of a power tool or vacuum cleaner coming from
the defendant's nearby apartment.  When
they approached the apartment's door, they could hear water being turned on and
off and could smell a strong odor of bleach and cleaning products.  The defendant then exited his apartment to
the sight of the officers standing outside his front door.  The officers observed that the defendant's
clothes were wet and that he smelled of a bleach-based cleaning solution.  The defendant agreed to accompany the
officers to the police station.  In the
apartment building's lobby, officers observed a box addressed to the defendant
from the same bodybuilding website that was branded on the blue draw-string
bags found in the third-floor trash bin.
      The defendant was arrested later that day
at the police station.  During the
booking process, officers observed that the defendant had abrasions or marks on
his forehead, neck, shoulder, back, arm, and hands.
      After the defendant was taken into
custody, officers obtained and executed a warrant to search his apartment.  There, they discovered, among other things, a
piece of green rope, a handsaw with red-brown stains on the blade that was
removed from its handle, and cleaning supplies.[2]  They also observed red-brown stains on the
floor beneath a carpet, some of which tested positive for the presence of
blood.
      The next day, an autopsy was conducted on
the victim's remains.  The medical
examiner observed signs of trauma at multiple points on the victim's head,
including an abrasion on the left side, as well as a fracture to at least one
of the cartilaginous rings around the trachea in the victim's neck and
petechiae[3] present in the victim's eye lids. 
Although the medical examiner had difficulty determining the cause of
death due to the "extensive trauma to the neck and the tissues surrounding
the neck" and the nature and severity of the wounds, the potential causes
of death included trauma and death by asphyxiation.  After the autopsy, a forensic anthropologist
examined the victim's bones and determined that the victim's body was cut apart
using a manual saw.
      b. 
The trial.  The defendant was
tried before a jury on charges of murder and improper disposal of human
remains.  As part of the Commonwealth's
case, Cambridge police officers, State police troopers, security personnel from
the business nearby the defendant's apartment, forensic scientists from the
State police crime laboratory, the medical examiner, and the forensic
anthropologist testified concerning the various investigative efforts detailed
above.  Additionally, an employee from a
gym, where the defendant was a member, testified that, in the weeks before the
murder, the defendant approached him and asked what cleaning product the
employee used to clean the gym mats; the employee, who used a bleach-based
cleaning solution with a chemical scent, told the defendant that he used a
"chemical solution . . . to wipe off the blood or sweat or
anything that we can't really see."
      i. 
The defendant's testimony. 
Although defense counsel conceded in his opening statement that the
defendant was guilty of improper disposal of human remains, the defendant
testified in his own defense as to the charge of murder.  According to the defendant, he and the victim
met in about 2006 and had been friends since 2008.  They shared an interest in rap music –-
having recorded at least five rap songs together.  The defendant testified that on the night of
the victim's death, he and the victim met at the defendant's apartment around 6
or 7 P.M.  They went out a few times,
including to purchase alcohol, and then returned to the defendant's apartment
for an evening of drinking.
      According to the defendant, while
listening to music in his living room, the two friends began to argue over
"the validity of [the] rappers and the content of the music."  As the drunken argument became "kind of
heated," the victim "got really aggressive" with the defendant
and "slapped [the defendant], back handed . . . in the mouth
very, very hard."  The two men then
engaged in a "strenuous wrestling match" during which the victim
"attempted to put [the defendant] in a chokehold," but the defendant
"managed to maneuver around it." 
According to the defendant, during the "exchange of blows,"
the victim "was reciting that he was going to kill [the defendant]"
and "that it was over for [the defendant]."
      The
defendant claimed that he "fear[ed] for [his] life" and was
"struggling for [his] life" during the "very strenuous
fight," because he "thought [the victim] was really going to kill
[him]."  He further testified that
the victim was "very strong, very physically fit and capable."  The bout ended when the defendant put the
victim in a chokehold, which the defendant held until the victim passed out
because the defendant believed that the victim would kill him if he released
the chokehold.  The defendant claimed
that the entire fight lasted forty to fifty seconds in total.  However, the medical examiner testified that
asphyxiation is not instantaneous and takes minutes rather than seconds.
      The defendant further testified that,
after releasing the victim, he went to his desk chair, located in the same room
where the fight occurred, to form an apology for when the victim "got
up."  The defendant asserted that,
at that time, he believed the victim was "playing dead" and
"being a jokester." 
Approximately forty to fifty minutes later, the defendant checked on the
victim and realized he was dead.  The
defendant did not call the police because he thought they would not believe
that the victim's death was accidental.
      The defendant decided to remove the
victim's body from his apartment.  He
first attempted to put the body in a duffel bag to carry out of his apartment
but discovered the body did not fit.  He
then tied the victim's arms and legs together with a green rope, but the body
still did not fit.  After unsuccessful
attempts to fit the victim's body in the bag, the defendant concluded that he
needed to dismember the body to make it fit. 
The defendant moved the body to his bathtub where he proceeded to sever
the legs, arms, and head, using the hand saw that police later discovered in
his apartment.  He placed the limbs and
head in bags and disposed of them "elsewhere in the building" along
with the victim's clothes and identification cards, which he cut into
pieces.  The defendant then put the torso
in a duffel bag and carried it from his apartment to the walkway where it was
later discovered.
      The prosecutor cross-examined the
defendant on his physique and physical capabilities.  At the time of the killing, the defendant
weighed about 275 pounds.  Further, as
documented in a video he posted online, the defendant -- who acknowledged
his own strength -- could lift 235 pounds above his head and a forty-five
pound weight in one hand.  The defendant
further testified that he placed in weightlifting competitions at his local
gym, including a competition during which he deadlifted 455 pounds.
      ii. 
Rap music evidence.  At trial, two
rap songs written and recorded by the defendant were admitted in evidence.  Before each song was played, the trial judge
instructed the jury that they could only consider this evidence for the limited
purpose of the defendant's state of mind, identity, intent, plan, or knowledge
on the day of the murder and not for the purpose of showing anything about the
defendant's character or propensity for misbehavior.
      The first song, "Cavi's Demo,"
was discovered on a compact disc (CD) found in the defendant's bedroom closet
during a search of his apartment pursuant to a search warrant.  According to testimony from the victim's
brother, the defendant went by the nickname "Cavi."  Over the defendant's objection, the
Commonwealth introduced the audio recording and transcript of the first verse
of "Cavi's Demo" in evidence. 
The lyrics described decapitation and dismemberment:
"I
decapitated and dismembered his arms and legs just to get a woody
. . .  Then started chuckling
blood started dribbling down his arm and pant legs.  I told my man 'cut that shit.'  He said 'cut what?  We just butchered this fat fuck.'
. . .  'Saw the neck off from
the head,' he said.  'It's no rocket
science, I need to break this nigga's neck bone in two, pass the pliers.'"
The Commonwealth
introduced this evidence through the direct examination of a State trooper who
participated in the search that yielded the CD. 
During cross-examination, the trooper testified that he
"interpreted [the song] as a confession" and believed the song
"[f]oreshadow[ed]" the victim's murder.  The defendant testified that he wrote
"Cavi's Demo" about twelve to thirteen years prior to the
murder.  At the defendant's request, the
entire audio recording and transcript of "Cavi's Demo," which
featured the victim's voice, was admitted in evidence for context.
      An audio recording of the second rap song,
"The Virus," was discovered pursuant to a forensic search, pursuant
to a search warrant, of the defendant's computer.  The forensic examiner testified that the
audio file was last edited in January 2012, but had been copied onto the defendant's
computer on March 21, 2015.  Over the
defendant's objection, the Commonwealth played the following portion of the
audio recording of "The Virus," and admitted the corresponding
transcript in evidence:  "Yeah, my
nigga Johnny.  It was the fucking
computer.  And the Bermuda triangle, give
me the truth.  Like Kurt Angle, I
strangle you in a chokehold.  Behold the
greatest.  'Bouta spit."  The defendant testified that he knew of the
wrestler Kurt Angle and was aware that he "was popular for
chokeholds."  The defendant further
testified that a sheet of handwritten lyrics from "The Virus" dated
March 25, 2011, which was already in evidence, was written by the victim, and
that he (the defendant) wrote and recorded his own lyrics of that song around
that date.  After the Commonwealth
admitted the above excerpt of "The Virus," the defendant played for
the jury the entire audio recording of that song, which again featured the
victim's voice, and the full transcript was admitted in evidence.
      c. 
Procedural history.  In June 2015,
the defendant was indicted and arraigned on charges of murder in the first
degree, in violation of G. L. c. 265, § 1, and improper disposal
of human remains, in violation of G. L. c. 114, § 43N.
      Prior to trial, in March 2016, the
defendant filed a motion to suppress evidence, including the CD containing
"Cavi's Demo," obtained during searches conducted pursuant to four
search warrants.  His motion was denied
after a nonevidentiary hearing.  In April
2018, the Commonwealth filed motions in limine to admit, among other things,
"audio recording[s] and . . . document[s]" found on the
defendant's computer and in his apartment, including the audio recording of
"Cavi's Demo."  The next day,
the defendant filed oppositions to the Commonwealth's motions, along with a
separate motion in limine to exclude all rap music found on the defendant's
computer, including "The Virus." 
The motion judge, who was also the trial judge, subsequently ruled that
the Commonwealth could introduce the first verse of "Cavi's Demo" and
specific lines from the beginning of "The Virus."  The defendant also filed a motion in limine
to exclude records of his purchases of various items from an online retailer as
well as from a local hardware store.  The
motion judge ruled that the purchase history of some of the requested items,
including the rope and saw, could be admitted.
      In May 2018, a jury trial commenced
before the trial judge.  At the close of
the evidence, the defendant requested jury instructions on voluntary
manslaughter based on reasonable provocation, sudden combat, and excessive use
of force in self-defense.  The judge
denied the requests for reasonable provocation and sudden combat instructions
but provided a voluntary manslaughter instruction on excessive force in
self-defense.  On May 18, 2018, the jury
returned guilty verdicts on both indictments, with the conviction of murder in
the first degree based on a theory of deliberate premeditation.  The defendant was sentenced to life in prison
without the possibility of parole on the murder conviction and six months in a
house of correction, to be served concurrently with the murder sentence, on the
improper disposal conviction.  The
defendant timely appealed.
      2. 
Discussion.  In a defendant's
direct appeal from a conviction of murder in the first degree pursuant to
G. L. c. 278, § 33E, we "review raised or preserved issues
according to their constitutional or common-law standard and analyze any
unraised, unpreserved, or unargued errors, and other errors we discover after a
comprehensive review of the entire record, for a substantial likelihood of a
miscarriage of justice" (citation omitted).  Commonwealth v. Tyler, 493 Mass. 752, 758
(2024).
      a. 
Rap music evidence.  The defendant
contends that the trial judge's admission of the rap music evidence, when
analyzed under the standards applicable to bad act evidence, was erroneous
because the music lacked a sufficient nexus to the crimes and its probative
value was outweighed by the risk of unfair prejudice.[4]  We review the judge's admission of the rap
music evidence for an abuse of discretion. 
See Commonwealth v. Correia, 492 Mass. 220, 227 (2023).
      We analyze rap music evidence as bad act
evidence when, as here, it "convey[s] ideas or acts that themselves could
be considered bad acts and . . . reflect poorly on [the defendant's]
character."  Correia, 492 Mass. at
228-230.  Bad act evidence "is not
admissible to demonstrate the defendant's bad character or propensity to commit
the crimes charged," id. at 228, but may be admissible for other purposes,
such as "to prove motive, opportunity, intent, preparation, plan, [or]
knowledge" (quotation omitted), Commonwealth v. Peno, 485 Mass. 378, 385
(2020).  See Mass. G. Evid. § 404(b)(2)
(2024).  Even when offered for a
permissible purpose, bad act evidence is not admissible if the "probative
value is outweighed by the risk of unfair prejudice to the defendant, even if
not substantially [so]" (citation omitted).  Correia, supra at 228-229.
      Here, the rap music evidence was not
offered for improper propensity purposes; the Commonwealth did not introduce it
to show that the defendant had a propensity for violence and thus was more
likely to have committed the murder. 
Rather, where the defendant admitted to killing and dismembering the
victim but claimed to have done so in self-defense, the Commonwealth offered
this evidence to undermine his claim of self-defense and to provide an
alternative explanation for the defendant's otherwise "inexplicable act of
violence" (citation omitted). 
Commonwealth v. Veiovis, 477 Mass. 472, 485 (2017).  Specifically, the Commonwealth sought to show
that the defendant was fascinated with murder, strangulation, decapitation, and
dismemberment, and that he acted on these interests when he killed the victim.  Therefore, this evidence went to the
defendant's state of mind and intent. 
See id. at 484 (images of human dissection on defendant's wall were
"probative of the defendant's state of mind as a person fascinated by
amputation and human dissection, and of an intent to seize the opportunity of
these killings to engage in actual amputations and human
dissection").  Thus, the rap music
evidence was offered for a permissible noncharacter purpose.
      Next, we consider whether the probative
value of the rap music evidence was outweighed by the risk of unfair prejudice
to the defendant.  See Correia, 492 Mass.
at 228.  When determining the probative
value of rap music, we evaluate the "nexus" of the lyrics to the
"issues to be decided in the case." 
Id. at 231 (adopting nexus test applied by courts in other
jurisdictions).  See, e.g., Montague v.
State, 471 Md. 657, 691-692 (2020); State v. Skinner, 218 N.J. 496, 500, 522
(2014).  "This 'nexus' can be
direct -- where rap music or lyrics recount key details of the events in a
case," but may also be indirect -- "where a defendant expresses
through music evidence of knowledge, a motive, or another relevant fact in
dispute, even though the music is not a literal account of events that took
place."  Correia, supra.  The details in the lyrics need not
"compare perfectly to [the] actual [crime]" to have a sufficient
nexus; rather "there [must be] a logical connection between that evidence
and the crimes charged."  State v.
Koskovich, 168 N.J. 448, 485 (2001).
      Here, the judge did not abuse her
discretion in finding that the rap music evidence bore a sufficient nexus to
the issues in this case and that this evidence was not unfairly
prejudicial.  The defendant's songs
provide evidence of his state of mind and intent, which were contested at
trial, as the defendant claimed to have killed the victim in self-defense.  See Correia, 492 Mass. at 231.  Additionally, even if not a literal account
of the events that would transpire, the lyrics aligned with key details of the
killing.  The defendant rapped about
strangling a person "in a chokehold," as well as sawing a person's
head off and "dismember[ing] his arms and legs" -- which is
exactly what he did to the victim's body. 
Further, in "The Virus," the lyrics reference "Johnny,"
who the jury could have reasonably inferred to be the victim, Jonathan
Camilien.[5]
      When determining the admissibility of rap
music evidence, we also consider whether the lyrics have a sufficient
"temporal nexus" to the crime (citation omitted}.  Correia, 492 Mass. at 231.  Here, although the defendant testified that
he wrote "Cavi's Demo" twelve to thirteen years prior to the victim's
killing, this testimony did not have to be credited.  Moreover, because the victim's voice can also
be heard on the recording of "Cavi's Demo," the CD must have been
created after the defendant met the victim, which, according to the defendant,
occurred in 2006 -- nine years prior to the killing.  In any event, "[t]emporal remoteness is
not an exercise in line drawing." 
Peno, 485 Mass. at 386.  Notably,
the CD containing "Cavi's Demo" was discovered in the defendant's
bedroom soon after the victim's death. 
See Koskovich, 168 N.J. at 485 (sufficient temporal nexus where violent
song lyrics "were recovered from [the] defendant's bedroom shortly after
the killings and thus were reasonably close in time to the offenses
charged").  Thus, the defendant's
testimony about when he wrote the lyrics did not preclude the trial judge from
determining, in her discretion, that a sufficient temporal nexus existed
between that rap song and the crimes charged. 
As for "The Virus," the forensic examiner testified that the
audio file was copied onto the defendant's computer about two weeks before the
victim's death, which likewise allowed the judge to find that a sufficient
temporal nexus existed.  See Correia,
supra; Koskovich, supra.
      We now turn to the risk of unfair
prejudice.  We have recognized that
"[t]here is unique potential for prejudice when using 'the inflammatory
contents of a person's form of artistic self-expression,'" including rap
music (citation omitted).  Correia, 492
Mass. at 230.  However, any prejudicial
effect may be reduced by providing proper limiting instructions to the
jury.  Id. at 231–232.
      Here, the rap lyrics had the potential to
prejudice the defendant because they contained violent imagery and offensive,
racially charged language.  See Skinner,
218 N.J. at 500.  However, the trial
judge was within her discretion in concluding that this risk did not outweigh
the probative value of the evidence.  The
lyrics here did not include generalized depictions of crime and violence, but
rather discussed specific violent acts that directly correspond with the facts
of the case.  Cf. State v. Cheeseboro,
346 S.C. 526, 550 (2001), cert. denied, 535 U.S. 933 (2002) (lyrics, containing
"general references glorifying violence" and lacking identifying
details of crimes committed, had minimal probative value).  Importantly, the judge provided proper
limiting instructions, both before the audio recording of each song was played
and during the final instructions to the jury, thereby further reducing the
risk of unfair prejudice.[6]  See
Correia, 492 Mass. at 231.  See also
Commonwealth v. Crayton, 470 Mass. 228, 252 (2014) ("case[s] where we
conclude that it was an abuse of discretion to admit the 'bad act,' even with a
limiting instruction," are "unusual").  Lastly, as evidenced by her ruling that only
the lyrics with the closest factual nexus to the crimes charged would be
admitted in evidence, the judge further limited the risk of unfair prejudice by
conducting an individualized analysis of each lyric, as required.  See Correia, supra at 230.
      Thus, it was not an abuse of discretion
for the trial judge to admit the rap lyric evidence.  See Correia, 492 Mass. at 228-230.
      b. 
Validity of search warrants.  The
defendant next challenges the denial of his pretrial motion to suppress.  He asserts that the rap music evidence should
have been suppressed because the search warrants used to obtain this evidence
were unsupported by probable cause and lacked particularity.  "The question whether there was probable
cause to issue [each] search warrant is a question of law that we review de
novo."  Commonwealth v. Perkins, 478
Mass. 97, 102 (2017).  See Commonwealth
v. Lepage, 494 Mass. 67, 76 (2024) ("In reviewing the denial of a motion
to suppress, we . . . assess the correctness of the judge's legal
conclusions de novo" [citation omitted]).
      The Fourth Amendment to the United States
Constitution and art. 14 of the Massachusetts Declaration of Rights require
search warrants to be supported by probable cause, meaning the affidavit
submitted with the search warrant application must provide a "substantial
basis to conclude that the items sought are related to the criminal activity
under investigation, and that they reasonably may be expected to be located in
the place to be searched at the time the search warrant issues"
(quotations and citation omitted). 
Commonwealth v. Alexis, 481 Mass. 91, 101-102 (2018).  Stated differently, "the government must
show not only that there is probable cause that the individual committed a
crime but also that there is a 'nexus' between the alleged crime and the
article to be searched or seized." 
Commonwealth v. Snow, 486 Mass. 582, 586 (2021).
      The Fourth Amendment and art. 14 also
"require that a search warrant describe with particularity the places to
be searched and the items to be seized." 
Commonwealth v. Perry, 489 Mass. 436, 459 (2022).  See Commonwealth. v. Valerio, 449 Mass. 562,
566 (2007).  To comply with this
requirement, "a warrant must describe the object[s] of the search with
enough specificity that investigators can identify, with reasonable certainty,
that which they are authorized to search, thus ensuring that they search only
those items for which probable cause exists."  Perry, supra. 
"The precise degree of particularity required necessarily var[ies]
according to the circumstances and the type of items involved" (quotation
and citation omitted).  Id.
      In this case, three separate search
warrants are at issue.[7]  The warrants
were executed sequentially, and each successive warrant application relied at
least in part on information derived from the fruits of the prior search.  Accordingly, we consider the validity of each
challenged warrant separately, following the chronological order in which they
were issued.
      i. 
First warrant.  The first warrant
authorized a search of the defendant's apartment for telephones, wallets, and
computers, among other items, to help determine the victim's identity.  Pursuant to this warrant, police seized the
defendant's computer tower, which was then forensically searched pursuant to
the third warrant.[8]  The affidavit
submitted in support of the first warrant described the police's investigation
from the point when the victim's dismembered torso was discovered until the
defendant emerged from his apartment, before he was taken into custody.
      We conclude that the facts described in
this affidavit established probable cause for the search and that the warrant
was sufficiently particular.  See Perry,
489 Mass. at 459; Snow, 486 Mass. at 594. 
First, the affidavit established probable cause to believe that the
defendant improperly disposed of the victim's remains.[9]  Additionally, the items sought bore a
substantial nexus to the suspected crimes because the identity of the victim
was relevant to the police's investigation.[10] 
The defendant, however, argues that the items sought had no nexus to the
crimes because the victim's identity "already was known" to the
police from the fragments of the identification cards found with the body parts
in the apartment building's third-floor trash room.  This argument fails because the police had
not yet confirmed whether the human remains corresponded to the owner of the
identification cards -- or whether the remains came from a single
person.  Furthermore, "there is
nothing in the jurisprudence of . . . the Fourth Amendment that
permits a [judge] to invalidate a warrant supported by probable cause based on
the [judge's] belief that the police simply do not need to seek further
evidence of a crime."  Commonwealth
v. Jones, 605 Pa. 188, 193, 202, cert. denied, 562 U.S. 832 (2010) (judge erred
in concluding it was unnecessary for police to obtain further information
concerning identity of victim).
      The first warrant was also sufficiently
particular because it specifically described the place to be searched --
i.e., the defendant's apartment -- and the items to be seized --
i.e., telephones, wallets, and computers. 
See Perry, 489 Mass. at 459.  The
defendant asserts that this warrant lacked particularity because it did not
contain a temporal limit and thus violated the rule in Snow, 486 Mass. at 594.
      We held in Snow, 486 Mass. at 594, that a
warrant to search a cell phone "presumptively must contain some temporal
limit."  When determining the proper
temporal scope for a cell phone search, judges consider "'the type of
crime, the nature of the [evidence] sought, and normal inferences' about how
far back in time the evidence could be found."  Id., quoting Commonwealth v. White, 475 Mass.
583, 589 (2016).
      Even assuming our holding in Snow applies
to all the electronic devices at issue, a temporal limit was not required
because, while the warrant allowed police to search for and seize cell phones
and computers, it did not authorize a search of the content of these
items.  See Snow, 486 Mass. at 594
("officers are free to seize and hold cell phones" until they obtain
broader warrant to search cell phone).
     ii.  Second warrant.  The second warrant authorized a search of the
defendant's apartment for, among other items, documents, in electronic or paper
form, showing the defendant's purchase history and his "motive and/or
state of mind prior to, during and after the killing."  Pursuant to this warrant, officers seized the
CD containing the rap song "Cavi's Demo" and a computer hard drive on
which the audio recording of "The Virus" was later discovered, after
a forensic search was conducted pursuant to the third warrant.
      In addition to reiterating the facts from
the first warrant's affidavit, the supporting affidavit for the second warrant
also described the results of the autopsy, the evidence obtained during the
first search, and additional information the police had learned over the course
of the investigation.  For example, the
police discovered in the defendant's apartment a twelve-inch carpentry saw that
was likely used to dismember the victim's body. 
Also detailed in the affidavit was that investigators learned through
the cooperation of an online retailer that the defendant purchased the saw from
the retailer on September 5, 2012, and that, prior to the killing, the defendant
had asked staff members at his gym how they cleaned blood from the floors.  Additionally, the defendant reportedly told
another gym member several weeks prior that he "had killed people before,
chopped them into pieces[,] and buried them in [a] back yard."  However, when police spoke with this gym
member, he appeared nervous and anxious and "denied having an unusual
conversation with [the defendant] but provided some degree of confirming
detail."
      As discussed above, the details of the
investigation from the first affidavit established probable cause to believe
that the defendant improperly disposed of the victim's remains; further
bolstered by the new averments in the second affidavit, probable cause was also
established to believe that the defendant murdered the victim.  See Perry, 489 Mass. 459; Snow, 486 Mass. at
594.  There was also a sufficient nexus
between the items sought and the suspected crimes,[11] given that the
defendant, prior to the killing, asked gym staff about cleaning blood and
potentially claimed that he had killed and chopped up people -- suggesting
that the murder was premeditated. 
Additionally, that the defendant ordered, through an online retailer,
the saw that was likely used to dismember the victim provided reason to believe
that the defendant's order history would aid investigators by, for example,
further establishing the defendant's method or means of committing the crimes.[12]  See Commonwealth v. Ashman, 430 Mass. 736,
744 (2000) ("Evidence that a defendant possessed a weapon that could have
been used to commit a crime is relevant to prove that the defendant had the
means of committing the crime").
      The second warrant was also sufficiently
particular.  Like the first warrant, even
assuming that the rule in Snow is applicable to the electronic devices here,
the second warrant did not require a temporal limit because it did not
authorize the search of the electronic items seized and no such search occurred
pursuant to that warrant, at least with respect to the computer hard drive.  See Snow, 486 Mass. at 591–592.[13]
      iii. 
Third warrant.  The third warrant
authorized a forensic examination of the defendant's computer tower and three
external hard drives seized pursuant to the first two warrants.[14]  The warrant limited the search to files
related to the defendant's mental state and relationship with the victim.  As a result of the ensuing forensic search,
the audio recording of "The Virus," which featured both the
defendant's and the victim's voices, was discovered.
      The supporting affidavit for the third
warrant contained the same information as the first two affidavits and the
following additional relevant facts.  On
the day that the victim's remains were discovered, police traveled to the
victim's apartment and met the victim's brother, who lived with the
victim.  The brother told police that the
victim and the defendant had a tumultuous relationship, which began sometime in
2010 or 2011, and that they made rap music and played online games together.
      The victim's brother also informed police
that the defendant suffered from schizophrenia and took medication for this
condition.  After the defendant stopped
taking his medication for one week sometime in 2014, he believed that the devil
was after him.  According to the brother,
on March 29, 2015, less than one week before the victim's death, the defendant
told the victim that they could not be friends anymore because the defendant
was hearing voices that "Johnny was bad."  The defendant also told the victim that the
defendant "need[ed] [his] meds" and that "if he goes off them[,]
he goes crazy."
      With the victim's brother's consent,
police searched the victim's bedroom. 
During the search, the brother guessed the password on the victim's
computer and opened an application called "STEAM," which police
learned was a gaming website used by the victim to communicate with the
defendant.  The brother identified the
victim's STEAM username as "JMC." 
On the screen, officers could see that an image of the defendant was
associated with the username "9th Gate Spymaster."  The brother then opened the "chat
window" that displayed the last online conversation between
"JMC" and "9th Gate Spymaster" on March 27, 2015.  Police subsequently conducted an Internet
search; discovered that the defendant, in addition to having an account on
STEAM, had accounts on several different social media websites, including
Facebook, Google Plus, and YouTube; and obtained the defendant's usernames for
those accounts.
      To establish probable cause to search the
contents of a computer-like device, "police first must obtain information
that establishes the existence of some 'particularized evidence' related to the
crime" that they believe is likely to be found on the device in question
(citation omitted).  White, 475 Mass. at
589.  See Riley v. California, 573 U.S.
373, 393-394 (2014).  "[T]here must
be 'specific, not speculative,' evidence linking the device in question to the
criminal conduct" (citation omitted). 
Commonwealth v. Henley, 488 Mass. 95, 116 (2021).
      As with the first and second affidavits,
the facts in the third affidavit were sufficient to establish probable cause to
believe that the defendant committed the crimes.  See Perry, 489 Mass. at 459; Snow, 486 Mass. at
594.  The additional information in the
third affidavit also established that particularized evidence related to the
crimes -- that being communications and electronic files concerning the
defendant's mental state and relationship with the victim, which were relevant
to the question of premeditation -- was "likely to be found on the
device[s] in question" –- i.e., the defendant's computer and hard
drives.  White, 475 Mass. at 589.
      Among that information in the affidavit,
police learned through the victim's brother that the defendant and the victim
would make rap music, chat online,[15] and play online video games
together.  Although "information
that an individual communicated with another person, who may have been linked
to a crime, without more, is insufficient to establish probable cause,"
Commonwealth v. Morin, 478 Mass. 415, 426 (2017), such information must be
considered within the context of the affidavit as a whole, rather than in
isolation, see Snow, 486 Mass. at 588.  Here,
while the communications and hobbies shared between the defendant and the
victim are innocuous enough in isolation, the affidavit provided sufficient
additional information.
      In particular, the affidavit described
strong evidence, as relayed above, that the defendant murdered the victim without
an "apparent instigating event." 
Henley, 488 Mass. at 118. 
Additionally, supplemental averments in the third affidavit on the
tumultuous nature of the defendant's relationship with the victim and the
defendant's statement that "Johnny was bad," made less than one week
before the killing, provided further evidence that the murder was premeditated.
      When considering the foregoing details
together, there was probable cause to believe that a search of the defendant's
computer or external hard drives would yield relevant online communications
between the defendant and the victim, or other relevant files concerning their
relationship or the defendant's mental state, to assist police in determining a
motive for the killing or establishing the defendant's intent.  Thus, there was a sufficient nexus between
the suspected crimes and the specific items sought.
      The defendant asserts that this warrant
was likewise overbroad because it did not include a temporal limit.  Again assuming that our holding in Snow
applies to the search of the electronic devices at issue here –- i.e.,
computers and hard drives -- the evidence that the defendant seeks to
suppress -- the audio recording of the "The Virus" -- would
have fallen within the scope of a reasonable temporal limit.  See Snow, 486 Mass. at 594 (remedy for
overbroad warrant "is partial suppression only of the evidence that fell
outside what would have been a reasonable scope").  As noted previously, an audio file of
"The Virus" was saved on the defendant's computer about two weeks
before the killing and less than one week before the latest online
communication between the defendant and the victim, negating the defendant's
temporal limit claim.  See Henley, 488
Mass. at 121-122 (where record showed "long-standing relationship between
the defendants and the victim," reasonable temporal limit for cell phone
search "would extend beyond just the day of the murder or even the days
leading up to the murder"); Commonwealth v. Holley, 478 Mass. 508, 525,
527-528 (2017) (scope of seventeen days for search of cell phone may have been
too broad, but defendant was not prejudiced because only messages from four
days before shooting were admitted).
      c. 
Record of online purchases.  The
defendant further contends that the trial judge erred in admitting in evidence,
without providing a limiting instruction, a record of purchases he made through
an online retailer about three to four years prior to the killing.  Of note, the record lists the defendant's
purchases of the carpentry saw used to dismember the victim's body, a rope with
which the defendant attempted to bind the body, and a set of pliers.  The record shows that the defendant purchased
the rope on June 29, 2012, and purchased both the carpentry saw and the pliers
on September 1, 2011.  The defendant
contends that the record of online purchases should have been analyzed as prior
bad act evidence and excluded because it lacked probative value and was highly
prejudicial.
      As discussed previously, when prior bad
act evidence is offered for a permissible, nonpropensity purpose, it "is
admissible only if its probative value is not outweighed by its prejudicial
effect."  Commonwealth v. West, 487
Mass. 794, 805 (2021).  Such evidence is
sufficiently probative when there is "a 'logical relationship' between the
prior bad act and the crime charged" (citation omitted), id., and it is
"not . . . too remote in time" (citation omitted), Peno,
485 Mass. at 386.  When reviewing a
ruling on prior bad act evidence, we consider "whether the trial judge
carefully weighed the probative value and prejudicial effect of the evidence
introduced at trial[,] . . . whether the judge mitigated the
prejudicial effect through proper limiting instructions[, and] . . .
whether the challenged evidence was cumulative of other admissible evidence,
thereby reducing the risk of any additional prejudicial effect."  West, supra at 807.
      Assuming, without deciding, that the
defendant's record of online purchases qualified as prior bad act evidence, we
conclude that -- even considering the more "rigorous"
admissibility test for prior bad act evidence -- it was not an abuse of
discretion for the trial judge to allow the admission of that record without
providing a limiting instruction.  See
Correia, 492 Mass. at 228-230.  First,
the record of the defendant's online purchases was probative of the defendant's
state of mind and intent -- the central issues at trial.  With respect to the saw and rope, that the
defendant rapped about dismembering a person, purchased items that could be
used to bind and dismember a person, and then actually used these very items to
bind and dismember the victim after the defendant had killed him tended to
support the Commonwealth's theory that the defendant had a long-standing
fantasy about dismemberment, acquired the appropriate tools, and then killed
the victim to carry out this fantasy. 
See Commonwealth v. Guy, 454 Mass. 440, 444 (2009) ("Evidence of
the defendant's fascination with murder and serial killings was relevant to the
issue of intent and motive").  See
also McConnaughey v. United States, 804 A.2d 334, 339 (D.C. 2002) ("[a]n
accused person's prior possession of the physical means of committing the crime
is some evidence of the probability of his guilt").
      The
defendant's purchase of the pliers also had probative value, even if less so
when compared to the other items.  While
we have generally cautioned against admission of "a weapon [that]
definitively could not have been used in the commission of the crime," the
probative value of the pliers was enhanced by its connection to the saw.  Veiovis, 477 Mass. at 486.  In the song "Cavi's Demo," the
defendant specifically rapped about using pliers to break a neck bone in half
and "[s]aw[ing] the neck off" of someone.  Although there was no evidence that the
defendant used pliers to kill or dismember the victim, they were purchased on
the same day as the saw that the defendant used to dismember the victim.  Thus, the parallel between the lyrics in
"Cavi's Demo" and the defendant's purchase of the pliers and the saw
together tends to make more probable that the defendant had the state of mind
to carry out the acts about which he rapped, and in fact prepared to do so.
      Additionally, these purchases from about
three to four years before the crimes were not too remote in time to have a
sufficient nexus to the case, particularly given that two of the items
purchased were used by the defendant at the time of the crimes.  See United States v. Mujahid, 433 Fed. Appx. 559,
562 (9th Cir. 2011) (jailhouse recordings from about five years before charged
offense were not too remote where defendant, in recordings, admitted ownership
of same type of firearm for which he was indicted of possessing).  Again, "[t]emporal remoteness is not an
exercise in line drawing."  Peno,
485 Mass. at 386.  See, e.g.,
Commonwealth v. Sharpe, 454 Mass. 135, 144 (2009) (prior bad act evidence
occurring at least seven years before crime charged was not too remote).  We are not convinced by the defendant's
argument concerning the risk of unfair prejudice flowing from this
evidence.  "Evidence is unfairly
prejudicial only if it has an undue tendency to suggest decision on an improper
basis, commonly, though not necessarily, an emotional one" (quotation and
citation omitted).  Commonwealth v.
Foreman, 101 Mass. App. Ct. 398, 403 (2022). 
The defendant essentially asserts that he was prejudiced because this
evidence could have supported the Commonwealth's theory about bringing his
long-standing fantasies to life. 
However, even to the extent that this evidence had some tendency to
prejudice the defendant, we discern no abuse of discretion in the trial judge's
determination that it was not unduly prejudicial.  See Commonwealth v. Rosa, 468 Mass. 231, 241
(2014) ("the question is not whether admission of the [bad act evidence]
was prejudicial; it is rather whether it was unduly prejudicial" [emphasis
added]).  Rather than having an undue
tendency to promote an emotional or otherwise improper basis for the jury's
decision, the record of purchases, along with the rap lyric evidence, provided
a logical basis from which the jury could conclude that the defendant did not
merely stumble upon the means to dismember the victim after killing him, but
that the defendant potentially made these purchases in anticipation of living
out his fantasy.  See Peno, supra at
389.  See also Commonwealth v.
MacCormack, 491 Mass. 848, 864 (2023) ("Without the challenged evidence,
at a minimum, the jury would have lacked context about the defendant's state of
mind").  Additionally, the record
indicates that the judge "carefully weighed the probative value and
prejudicial effect," as she excluded two additional items originally listed
on the record of purchases -- a shovel and sledgehammer -- thus
limiting the evidence to only those items used in the murder or referred to in
the defendant's rap songs.  West, 487
Mass. at 807.
      Further, where the record listed
purchases of, in the defendant's words, "common household tools," it
did not present the same inherent risk of unfair prejudice as other bad act
evidence, such as evidence of prior domestic abuse or use of profane or
racially charged language.  See, e.g.,
Rosa, 468 Mass. at 241-242 (evidence of defendant's use of profane language and
racial epithet); Butler, 445 Mass. at 570, 575-576 (evidence of defendant's
prior instances of domestic violence). 
Unlike these other categories of bad act evidence, neither the record of
purchases nor the items listed within were illegal or socially repugnant and
thus, in isolation, were unlikely to "reflect poorly on [the defendant's]
character" and enflame the jury. 
Correia, 492 Mass. at 230. 
Instead, the record of purchases tended to show that the defendant
murdered the victim only when considered in the context of the specific facts
surrounding the victim's killing.  As
discussed above, this tendency properly arose from the logical inferences that
the jury could draw from this evidence –- i.e., that the defendant had the
means to carry out the crimes and may have contemplated doing so prior to the
killing -- rather than from an improper basis such as emotion.  Moreover, the act of purchasing various items
and tools is not so similar to the crimes for which these tools were ultimately
used as to increase the risk of propensity reasoning.  Thus, the record of purchases posed, at best,
little risk of unfair prejudice to the defendant.
      Lastly, considering the other relevant
factors, discussed above, we conclude that the absence of a limiting
instruction here did not amount to an abuse of discretion on the trial judge's
part.  "[T]here is no requirement
that the judge give limiting instructions sua sponte," and the defendant
did not request one.  Commonwealth v.
Cruzado, 480 Mass. 275, 279 (2018).  The
record indicates that the judge "carefully weighed the probative value and
prejudicial effect" as to each purchased item and excluded the defendant's
purchase of the shovel and sledgehammer. 
West, 487 Mass. at 807.  Further,
for the reasons explained above, the record of purchases that was admitted was
sufficiently probative and carried little risk of unfair prejudice.  Additionally, much of "the challenged
evidence was cumulative of other admissible evidence, thereby reducing the risk
of any additional prejudicial effect," as the other admitted evidence
showed that the saw and rope were used to dismember and dispose of the victim's
body.  Id.
      d. 
Prosecutor's closing argument. 
The defendant contends that the prosecutor misrepresented the
defendant's testimony during closing argument and that, because he was
prejudiced by this misattribution, reversal is warranted.  Specifically, in summarizing the defendant's
testimony about the argument that preceded the physical fight between the
victim and the defendant, the prosecutor stated that "[the defendant's]
words were, 'Jonathan [the victim] persisted in his opinion.'" (emphasis
added).  In actuality, the defendant
testified that he, not the victim, "persisted in [his] opinion."  While we agree the prosecutor misstated the
defendant's testimony,[16] we conclude that the defendant was not prejudiced by
this error.
      Where, as here, the defendant objected at
trial, we review for prejudicial error. 
See Commonwealth v. Tu Trinh, 458 Mass. 776, 785 (2011).[17]  We consider "whether the error was
limited to collateral issues or went to the heart of the case," "what
specific or general instructions the judge gave the jury which may have
mitigated the mistake," and "whether the error, in the circumstances,
possibly made a difference in the jury's conclusions" (citation
omitted).  Id. at 789.
      Here, the error did not go to the
"heart of the case."  Tu Trinh,
458 Mass. at 785.  The defendant argues
that the prosecutor tied her misstatement to the Commonwealth's theory of
premeditation by stating, shortly after the misstatement, that the defendant
"was thinking about what he wanted the outcome to be, he was planning his
response.  That is premeditation."  Despite this fleeting comment from the
prosecutor, whether the defendant or victim persisted in his opinion during the
alleged argument was not material to the Commonwealth's theory of
premeditation; rather, the Commonwealth's theory was based on evidence that the
defendant fantasized and composed rap songs about murder and dismemberment,
purchased the tools to carry out these acts, and then seized the opportunity to
live out his fantasy.
      Additionally, we are confident that this
misstatement did not have an impact on the jury's conclusions.  See Tu Trinh, 458 Mass. at 789.  The prosecutor's misattribution was a
"brief, isolated statement that was not egregious enough to infect the
whole of the trial" (quotations and citation omitted).  Commonwealth v. Fernandes, 487 Mass. 770, 792
(2021), cert. denied, 142 S. Ct. 831 (2022). 
Further, although the prosecutor technically misquoted the defendant,
that the victim also persisted in his opinion could reasonably be inferred from
the defendant's other testimony where he described the victim's steadfast contrary
opinion.[18]  See Commonwealth v.
Robinson, 493 Mass. 775, 788 (2024) ("A prosecutor's closing argument may
. . . analyze the evidence and suggest what reasonable inferences the
jury should draw from that evidence, . . . [which] need not be
necessary and inescapable, only reasonable and possible" [quotations and
citations omitted]).
      Finally, the trial judge provided adequate
instructions to mitigate any possible prejudicial effect.  When charging the jury prior to
deliberations, the judge instructed the jury that, to the extent their memory
conflicted with the attorneys' statements, their memory controls.  Although it was not specific to the
prosecutor's misstatement, "we presume the jury to have understood and
followed" this instruction.  Tu Trinh,
458 Mass. at 789.
      e. 
Manslaughter instructions.  The
defendant contends that the jury should have been instructed on voluntary
manslaughter based on reasonable provocation and sudden combat.  Since the defendant requested these
instructions and objected at trial when they were not provided, we review for
prejudicial error.  See Commonwealth v.
Miranda, 492 Mass. 301, 306 (2023).
      We conclude that, assuming error, the
defendant was not prejudiced, as "we are sure that the [assumed] error did
not influence the jury, or had but very slight effect" (citation
omitted).  Commonwealth v. Richards, 485
Mass. 896, 919 (2020).  Indeed, there was
scant evidence of reasonable provocation in this case.  See id. at 920 (no prejudice from failure to
instruct on reasonable provocation where "it [was] extremely unlikely that
any reasonable juror would have a reasonable doubt as to whether the victim
stabbed the defendant . . . [and] extremely unlikely that the juror
would conclude that the defendant did not use excessive force in self-defense
but acted instead with reasonable provocation").  First, it is unlikely that any reasonable
juror would have believed the defendant's claim that the entire fight lasted
forty to fifty seconds, when, as the medical examiner testified, asphyxiation
takes minutes rather than seconds.  See
Commonwealth v. Steeves, 490 Mass. 270, 292 (2022) ("manual strangulation
requires sustained force over a prolonged period of time to accomplish death,
during which an objectively reasonable person would likely have 'cooled
off'"); Commonwealth v. Felix, 476 Mass. 750, 759 (2017) ("the time
required to strangle the victim . . . supported a finding of
deliberate premeditation inconsistent with sudden provocation").  The length of time is crucial because, for
reasonable provocation to apply, "the killing must occur before there is
sufficient time for the defendant to cool off" (citation omitted).  Commonwealth v. Smith, 460 Mass. 318, 325
(2011).
      Second, it is also unlikely that any
reasonable juror would have concluded that "a reasonable person would have
become sufficiently provoked, and that the defendant was in fact provoked by
the victim's conduct" (quotation and citation omitted).  Commonwealth v. Bianchi, 435 Mass. 316, 329
(2001).  Even assuming that the jury
would have credited the defendant's testimony that the victim was the one to
deliver the first blow, the defendant was significantly larger than the victim,
as clearly observable in video footage from the night of the killing, and also
had substantial weightlifting capabilities, while the victim was described as
"slim."  See id. (that victim
punched defendant's face "add[ed] little to [the defendant's] claim of
provocation" where defendant "was a weightlifter who outweighed the
victim by more than 170 pounds"). 
See also Felix, 476 Mass. at 757 ("where the defendant outweighs
and is physically far more powerful than the victim," physical contact
between defendant and victim, even if initiated by victim, may not be enough
for manslaughter instruction based on provocation).  Further, the defendant also appeared to
sustain, at most, minor injuries from the victim's alleged attack.  See Commonwealth v. Garabedian, 399 Mass.
304, 314 (1987) (insufficient provocation where victim scratched defendant's
face and drew blood).
      Finally, the defendant's calculated
actions immediately following the victim's death do not suggest that the
killing was the product of heat of passion. 
See Commonwealth v. Sirois, 437 Mass. 845, 855 (2002) (no reasonable
provocation where "immediately after [the] shooting . . . , the
defendant walked back out to the car and drove off to the fair with his
children, . . . not displaying even the slightest degree of 'passion,
anger, fear, fright, or nervous excitement'" [citation omitted]).  Since the evidence of reasonable provocation
was so scant, we conclude that the defendant was not prejudiced by this
presumed error.[19]
      f. 
Nondeadly force instruction.  The
defendant asserts that the trial judge's nondeadly force instruction was
deficient because it did not include the following language from Commonwealth
v. Noble, 429 Mass. 44, 46 (1999), which the defendant had requested at
trial:  "Nondeadly force, such as
the force of one's fists, hands, and arms, is considered to be nondeadly even
if a death results."  Here, the
judge instructed the jury using the model jury instructions for deadly and
nondeadly force, stating:  "Deadly
force is force intended to or likely to cause death or serious bodily
harm.  Nondeadly force by contrast, is
force that is not intended to or likely to cause death or serious bodily
harm."  See Model Jury Instructions
on Homicide 35 (2018).
      The judge was "not required to give
[the] jury instruction[] in the exact manner requested by the defendant
provided that the requested instruction [was] adequately covered."  Miranda, 492 Mass. at 310.  The judge's instruction, which adhered to the
model instructions, was adequate.  See
id.  Moreover, the defendant's requested
instruction quoted dicta from Noble, 429 Mass. at 46, which, when taken out of
context, implies that the force of one's "fists, hands, and arms" is
per se nondeadly.  This is an incorrect
statement of the law; as we held in Noble, "[i]t was for the jury to
determine whether the headlock used by the defendant was deadly or nondeadly
force."  Id.  There was no error.
      g. 
Review under G. L. c. 278, § 33E.  Having reviewed the entire record, we discern
no reason to exercise our extraordinary authority under G. L. c. 278,
§ 33E.
      3. 
Conclusion.  Accordingly, we
affirm the judgments.
      So ordered.

footnotes

[1] The defendant
was also convicted of improper disposal of human remains.  He has waived any argument as to this
conviction on appeal.

[2] As the
defendant testified at trial, he purchased cleaning supplies to clean up after
dismembering the victim.

[3] Petechiae are
"minute reddish or purplish spot[s] containing blood that appear[] in skin
or mucous membrane as a result of localized hemorrhage."  Merriam-Webster's Collegiate Dictionary 926
(11th ed. 2020).

[4] The defendant
also briefly argues that the State trooper's improper opinion testimony on the
rap lyrics was prejudicial error.  We
disagree.  Because the primary challenged
portions of the trooper's testimony were elicited by defense counsel on
cross-examination, "the defendant's claim of prejudice is highly
suspect."  Commonwealth v. Otsuki,
411 Mass. 218, 236 (1991).  See
Commonwealth v. Moffat, 486 Mass. 193, 201 (2020) ("The testimony
. . . occurred during defense counsel's cross-examination, and
defense counsel neither moved to strike the answer nor moved to request a
curative instruction").  Nonetheless,
even assuming error with respect to this unpreserved issue, it did not create a
substantial likelihood of a miscarriage of justice.  The other evidence against the defendant was
very strong, and "the witness potentially expressed an impermissible
opinion only briefly."  Commonwealth
v. Robertson, 489 Mass. 226, 238, cert. denied, 143 S. Ct. 498 (2022).

[5] The victim's
brother testified that the victim's nickname was "Jonny."

[6] Before each
song was played, the judge instructed the jury that the rap music evidence was
"admitted only for a limited purpose . . . [of] whether it tells
you anything about [the defendant's] state of mind, identity, intent, plan, or
knowledge" and "may not [be] consider[ed] . . . as showing
anything about [the defendant's] character."  Additionally, during the final instructions,
the judge instructed the jury that the "portions of [the] two songs have
been admitted only for a limited purpose . . . [of showing] anything
about this defendant's state of mind, his identity, his intent, plan, or
knowledge.  You may not consider this
evidence as showing anything regarding this defendant's character or in terms
of it showing any propensity for misbehavior."  While we find the instruction sufficient
here, we continue to encourage judges to provide specific limiting instructions
when possible.  See Commonwealth v.
Samia, 492 Mass. 135, 148 n.8 (2023) ("it falls upon the judge to
'articulate the precise manner in which the [bad act evidence] is relevant and
material to the facts of the particular case'" [citation omitted]).
      
[7] We note that,
with respect to another search warrant concerning the defendant's YouTube and
Google Plus accounts, the defendant raises no arguments on appeal.  Although this was the third search warrant to
issue, we refer to the warrant that issued fourth in time as the third warrant.

[8] The police
also seized the defendant's cell phone and later conducted a forensic search of
the cell phone pursuant to the third warrant. 
The defendant contends that the search and seizure of his cell phone,
like the other searches he challenges, were unconstitutional because the
warrants were unsupported by probable cause and lacked particularity.  However, the remedy for an unconstitutional
search or seizure is exclusion of the evidence derived from that search or
seizure; here, neither evidence obtained directly from the defendant's cell
phone nor any other fruit from the search of his cell phone was admitted at
trial.  See Commonwealth v. Pearson, 486
Mass. 809, 812 (2021) ("[T]he exclusionary rule bars the use of evidence
derived from an unconstitutional search or seizure" [citation
omitted]).  Even assuming, without
deciding, that the search of the cell phone was unconstitutional, "no
fruits -- tainted or otherwise -- were . . . admitted in
evidence," and therefore any error would have been "harmless beyond a
reasonable doubt."  Lepage, 494
Mass. at 78.

[9] Among other
facts, the affidavit detailed the following: 
video surveillance on the day the victim's remains were discovered
showed an individual leaving the defendant's apartment building with a bag,
walking to the location where police would later discover the duffel bag with
the dismembered torso, returning to the apartment building without a bag, and entering
the lobby at the exact time when the defendant's key fob was used to unlock the
door.  Human remains were found in the
trash room on the floor where the defendant resided in the apartment building.  Later that morning, coming from the
defendant's apartment, officers heard a vacuum cleaner and running water and
could smell a strong odor of chemicals, including bleach.  When the defendant opened his door, the
officers observed that he was wet and smelled of chemicals.

[10] Further, a
person would reasonably expect that the items sought would be located in the
defendant's apartment, particularly given the allegations within the affidavit
that tended to suggest the crimes had been committed there.  Cf. Commonwealth v. McDermott, 448 Mass. 750,
768, cert. denied, 552 U.S. 910 (2007) ("even when a murder is committed
away from a defendant's residence, sufficient probable cause exists to obtain a
warrant to search the residence when there is evidence that it was 'reasonably
likely' that the items specified in the affidavit could be found there"
[citation omitted]).

[11] Again, a
person would reasonably expect that the items sought would be located in the
defendant's apartment.

[12] The
defendant also challenges the seizure of a document with handwritten lyrics
from "The Virus."  From the
record it is unclear whether this evidence was seized pursuant to the first
warrant, which also authorized the search and seizure of "any notes
. . . or documents that would show the relationship between the
[defendant] and the victim," or the second warrant, as the items returned
for both warrants include "[m]iscellaneous paperwork."  Regardless, the supporting affidavit for each
warrant established probable cause to seize this document, which ends with the
victim's initials in large, artistically embellished letters.

[13] The officers
did listen to the CD containing "Cavi's Demo," as mentioned in the
supporting affidavit for the third warrant. 
There is no indication in that affidavit of any dates establishing when
the defendant copied a recording of "Cavi's Demo" onto the CD.  Still, as discussed previously, the CD was
found in the defendant's bedroom.  See
Koskovich, 168 N.J. at 485.  Nonetheless,
the defendant asserts that the police exceeded the scope of this warrant by
listening to the CD, when the warrant did not provide specific authorization to
do so.  Even assuming separate
authorization was required to listen to the CD after it was properly seized,
suppression is unnecessary.  Under the
inevitable discovery exception, lawful discovery by the police of the
"Cavi's Demo" audio recording "was certain as a practical
matter" (citation omitted). 
Commonwealth v. Linton, 456 Mass. 534, 558 (2010).  There can be "no doubt that the police
agenda here included [listening to the CD] . . . [as] the only value
[the CD] could possibly add to the investigation relied upon a legal further
search of [its] contents." 
Commonwealth v. Fernandes, 485 Mass. 172, 186 (2020), cert. denied, 141
S. Ct. 1111 (2021).
      Further, the facts described in the
affidavit for the third search warrant -– excluding any reference to the
content of the CD, which only comprised several sentences among ten pages of
other detailed information -- would have established probable cause to
listen to the CD.  See Commonwealth v.
McAfee, 63 Mass. App. Ct. 467, 478 (2005) ("even if the [unlawfully
obtained] information . . . is excised from the search warrant
application, the application still established probable cause for the proper
issuance of the warrant").  Among
these facts were the disclosures by the victim's brother that the defendant and
the victim created rap music together and that the defendant's nickname was
"Cavi."  The affidavit also
contained facts concerning the discovery by the police of a handwritten copy of
rap lyrics (from "The Virus") in the defendant's bedroom.  These facts provided a reasonable basis to
conclude that rap music created by the defendant would likely be found on the
CD -- which, as stated in the affidavit, was labeled "Cavi's Demo" --
and that such rap music could provide information about the defendant's state
of mind or relationship with the victim.

[14] This warrant
also authorized the search of the defendant's cell phone seized pursuant to the
first warrant, but for the reasons discussed in note 8, supra, any error in
denying the defendant's request to suppress the content of the cell phone would
have been harmless.

[15] Police also
discovered that the defendant had numerous other social media accounts,
which -- like "STEAM" -- could have been used to
communicate with the victim.

[16] The
Commonwealth asked the defendant on cross-examination, "[H]ow did that
discussion [before the killing] turn into an argument?"  The defendant replied, "It just did, it
became argumentative when [the victim] strongly disagreed, and I persisted in
my opinion" (emphasis added).

[17] At the end
of the prosecutor's closing argument, the defendant objected to the
prosecutor's statement that the defendant was "angry" because the
victim persisted in his opinion. 
Although the objection was not articulated at trial in the exact manner
as the defendant now frames the issue on appeal, we find that the objection was
sufficient to preserve the error for appellate review because it drew the
judge's attention to the relevant portion of the prosecutor's closing argument
and was made on the ground that the prosecutor had misstated the defendant's testimony.  See Commonwealth v. McDonagh, 480 Mass. 131,
138 (2018) ("Perfection is not the standard by which we measure the
adequacy of an objection"); Tu Trinh, 458 Mass. at 789 (to preserve
objection to prosecutor's closing argument, defendant must "seasonably
object[]").

[18] During
cross-examination, the prosecutor asked the defendant, "Do you remember
what you said right before [the victim] hit you?"  The defendant replied, in part, "I
. . . said something along the lines of [having] dis[d]ain for [the
victim's] opinion and he disagreed with me wholeheartedly and then he hit
me."  That the victim
"wholeheartedly" disagreed may be fairly read to mean that the victim
also persisted in his opinion.

[19] Because
sudden combat is a form of reasonable provocation, see Commonwealth v. Yat Fung
Ng, 489 Mass. 242, 266 (2022), cert. denied, 491 Mass. 247 (2023), we likewise
conclude that, even assuming that the facts warranted such an instruction, the
defendant was not prejudiced by the trial judge's failure to instruct the jury
on sudden combat, see Richards, 485 Mass. at 920.